[No. 38530-5-I.   Division One.   May 10, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. DARRELL ALLEN CLOUD, *Appellant*, JOHN HENRY BROWN, *Respondent*.

*Eric Broman* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Bryan M. McDonald, Deputy*, for respondent.

*John Henry Browne* and *Allen M. Ressler* of *Browne & Ressler*; and *Rita J. Griffith*, for respondent intervenor.

AGID, A.C.J. — In January 1994, Darrell Cloud fatally shot Neal Summers, the teacher who had sexually abused him for over 10 years. Despite expert testimony that Cloud suffered from insane delusions at the time of the shooting, Cloud's jury convicted him of murder in the first degree. He moved to set aside the verdict, alleging ineffective assis-

tance of counsel. After a posttrial hearing at which Cloud's counsel was allowed to intervene as a party, the trial court found that Cloud had suffered no prejudice as a result of his counsel's advice and denied his motion.

On appeal, Cloud alleges that various procedural, evidentiary, and constitutional errors at trial and the posttrial proceeding require setting aside the verdict and granting a new trial. We agree with Cloud that permitting his former counsel to intervene as a party in the posttrial proceeding was error and reverse and remand for a new hearing on Cloud's motion for a new trial. In addition, because the provisions of the "three strikes rule" which apply to first-time offenders unconstitutionally exceed the scope of the initiative's ballot title, we remand for the imposition of a new sentence which permits Cloud to earn early release time.

## FACTS

In 1982 when Darrell Cloud was in eighth grade, he applied for a position as a teacher's aide with Neal Summers, a popular teacher at Whitman Middle School. The following summer, when Cloud was 13, Summers initiated sexual contact with him, which Cloud resisted. Summers persisted and eventually coerced Cloud into "hundreds of incidents of sexual abuse," primarily by bribing Cloud and plying him with alcohol.[1]

On the morning of January 31, 1994, Cloud waited in his car for Summers to arrive at Whitman school. As Summers entered the school building, Cloud fatally shot him from a distance of approximately 150 feet. Cloud eventually confessed to the murder, and accompanied police to his girl

---

[1]The record is replete with handwritten notes from Summers to Cloud which support Cloud's allegations. As the trial prosecutor testified at the posttrial hearing, the evidence "was about as graphic as . . . evidence could get in terms of documenting the types of . . . abuse that Darrell suffered . . . the writings, the games that were a part of this pattern of abuse, they were graphic, they were disgusting, and they were significant."

friend's house to recover the gun. After returning to the precinct, Cloud gave a tape-recorded statement detailing the shooting and outlining its precipitating events.

The State charged Cloud with one count of first degree murder. Before trial, the State offered Cloud an opportunity to plead to second degree murder, which Cloud declined on the advice of his counsel, John Henry Browne. Jury voir dire began on March 1, 1995. The next day, during voir dire of 16 potential trial jurors, three women were shot and killed on another floor of the courthouse. Cloud moved for a continuance based on the disruption the shooting caused, but the court ruled that the trial should proceed as scheduled.

At trial, both Cloud and the State introduced several psychiatric specialists who offered opinions about Cloud's sanity at the time of the shooting. Cloud moved for acquittal on insanity grounds at the conclusion of the evidence, but the court denied his motion, acknowledging that this was "a close case." The court then instructed the jury that it had a "duty" to convict Cloud if the State proved every element of the charged crime. On March 30, 1995, the jury found him guilty of murder in the first degree. Cloud filed a motion for a new trial based on the court's failure to continue the trial after the courthouse shooting, but the court denied the motion.

Shortly thereafter, Cloud fired Browne and hired James Lobsenz to bring an ineffective assistance of counsel claim against Browne for his allegedly incompetent advice during the plea bargaining process. Cloud said that Browne told him that he had a 95 percent chance of being acquitted on insanity grounds and that, even if he were convicted of first degree murder, he would not have to serve the full 20-year sentence. Following a lengthy hearing in which Browne intervened as a party, the trial court denied Cloud's motion to set aside the verdict, finding insufficient evidence of prejudice. In its written decision, the court stated that because "[b]oth the defendant and his father were of the opinion that the defendant should be freed and the de-

fendant rewarded," Cloud would have resisted a plea bargain even without Browne's advice. The court partially based this conclusion on its observation that "[n]ot long before trial, while the defendant was still at [Western State Hospital], he predicted for Detective Gebo that the likely outcome of [the] trial was that he would be set free with a pile of money." The court sentenced Cloud to a mandatory minimum of 20 years in prison, stating that although the "psychological torture-sex abuse" he suffered would normally "justify consideration of the exercise of exceptional discretion downward," the trial court did not have the authority to apply those mitigating factors to a first degree murder sentence. Under the version of RCW 9.94A.120(4) in effect at the time of the offense, Cloud is not authorized to earn early release time.

On appeal, Cloud alleges that the trial court erred in 1) permitting Browne to intervene in the posttrial proceeding, 2) relying on the statement he made to detectives at Western State Hospital, 3) finding that Browne's advice during the plea bargaining process did not result in prejudice, 4) denying his motion to continue, 5) instructing the jury that it had "a duty" to return a guilty verdict if the State proved all elements of the crime, and 6) sentencing him under a statutory scheme which unconstitutionally forecloses his right to earn early release.

## DISCUSSION
### I. Browne's Intervention

■ Browne sought to intervene in the posttrial ineffective assistance of counsel proceeding to protect his "personal, reputation, and business interests."[2] Although no rule authorizes third-party intervention in a criminal case, the trial court permitted his intervention, explaining:

This is an unusual case, unusual circumstances . . . because

---

[2]Washington courts have not addressed this issue, but at least one federal court has barred a former attorney from intervening in an ineffective assistance proceeding to protect his reputation. *See Harrelson v. United States*, 967 F. Supp. 909 (W.D. Tex. 1997).

of the fact that we have gone through the whole process and there has been no assertion of ineffective assistance, except as to this short factual pocket, I think that the court is interested in getting as full disclosure and argument as possible so as to make the best possible ruling with regard to what the facts are and what the legal meaning of those facts are as of this application. . . .

. . . .

In summary, I think that this is really the forum where Mr. Browne has an interest. I don't see it being effectively dealt with in some other forum. . . .

The trial court recognized that its decision might have far-reaching implications, but it decided to "take [its] chances with the slippery slope." Cloud contends that the trial court committed prejudicial error in allowing Browne to intervene,[3] and that the slope may be "higher, wider and more slippery than the trial court envisioned." We agree. Neither Browne nor the State has explained why Browne's interest in protecting his reputation provides a tenable rationale for his intervention in the posttrial proceeding.

Civil Rule 24(a)(2)[4] allows intervention of right to applicants who are "so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest . . . ."[5] The court did not specifically base its ruling on CR 24(a)(2), but it did state that this rule influenced its decision to allow Browne to intervene: "in the absence of criminal rules . . . in situations which are covered in similar civil rules, the court is

---

[3]Cloud contends that this ruling ignores the Washington Supreme Court's decision in *State v. Bianchi*, in which the court denied a newspaper's request for intervention in a first-degree murder prosecution, observing that "[t]here is no rule, statute, or precedent in this state that would allow a third party to intervene in a criminal proceeding." 92 Wn.2d 91, 92-93, 593 P.2d 1330 (1979). *Bianchi* is not controlling, however, because it concerns pretrial intervention requests in criminal trials and addresses rights of the press.

[4]Browne's motion was also brought under CR 24(b), which allows discretionary intervention.

[5]CR 24(a)(2).

usually at least guided by the civil rules."[6] Although the trial court was correct that civil rules " 'can be instructive' "[7] when criminal rules are silent on procedural matters, labeling Browne's full intervention rights in this posttrial proceeding "procedural" is an inaccurate characterization. As Cloud notes, Browne and his two attorneys "led the [S]tate's efforts, calling more witnesses, engaging in more cross-examination, and eliciting far more damaging information and expert opinion" than the State.[8] This active participation was not necessary. The prosecutor's interest in preserving the conviction, together with Browne's testimony as a witness, would have provided the trial court with an adequate basis for its decision.

Cloud consistently stated that his decision to fire Browne, his "closest friend in the world" at the time, was a difficult one, and that he did not want to hurt him, embarrass him, or "make him mad." After Cloud informed Browne of his decision to proceed with the ineffective assistance claim, both Cloud and Lobsenz testified that Browne threatened to reveal hurtful things about Cloud and his family. Although Browne correctly points out that an ineffective assistance claim waives the attorney-client privilege to the extent necessary to "respond to allegations in any proceeding concerning the lawyer's representation of the client,"[9] allowing a former attorney to intervene as a party in an ineffective assistance proceeding exceeds this limited waiver. Here, intervention pitted an attorney against his

---

[6]Because the trial court did not *rely* on the civil rule, the cases Cloud cites holding that civil rules do not apply to criminal cases do not establish that the trial court erred in using the civil rule for guidance.

[7]*State v. Cronin*, 130 Wn.2d 392, 397, 923 P.2d 694 (1996) (quoting *State v. Gonzalez*, 110 Wn.2d 738, 744, 757 P.2d 925 (1988)) (court relied on CR 5 to determine requirements for service of notice of special sentencing hearings); *State v. Scott*, 92 Wn.2d 209, 595 P.2d 549 (1979) (holding that CR 60(b) applies to criminal as well as civil judgments).

[8]Lobsenz stated that he felt as if he were opposed by "two prosecutors" and that the proceeding seemed "grossly unfair." Browne admitted that he had passed notes to the State's attorney during the posttrial hearing and had suggested questions for him to ask.

[9]*See* RPC 1.6(b)(2).

former client and created the opportunity to use against the client information garnered during the course of representation. This decision, if allowed to stand, would inevitably undercut the most fundamental value of the attorney-client relationship for future criminal defendants.

■ Browne also suggests that if he had not been allowed to intervene, there is a "substantial risk" that he would have been collaterally estopped from relitigating the adequacy of his representation. This argument is based on Washington's "virtual representation doctrine," which allows "collateral estoppel to be used against a nonparty when the former adjudication involved a party with substantial identity of interests with the nonparty."[10] In *Hackler v. Hackler*,[11] this court held that a witness in a trial who is "fully acquainted with its character and object,"[12] and "interested in [its] results"[13] may be collaterally estopped from bringing a later claim on the same issue. But Washington courts clearly hold that this doctrine may be used only when there is "some sense that the separation of the suits was the product of some manipulation or tactical maneuvering, such as when the nonparty knowingly declined the opportunity to intervene but presents no valid reason for doing so."[14] Because no authority exists which allows Browne to intervene in a criminal proceeding, and because the State's interests were not identical to Browne's,[15] Browne cannot use this doctrine as a justification for his intervention.

The trial court observed that this was an "unusual" case

---

[10]*Garcia v. Wilson*, 63 Wn. App. 516, 520, 820 P.2d 964 (1991).

[11]37 Wn. App. 791, 795, 683 P.2d 241, *review denied*, 102 Wn.2d 1021 (1984).

[12]*Id.*

[13]*Id.*

[14]*Garcia*, 63 Wn. App at 521 (citing *Bacon v. Gardner*, 38 Wn.2d 299, 313, 229 P.2d 523 (1951), *Hackler*, 37 Wn. App. at 795, and 18 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4457, at 494-502 (1981)).

[15]The State confirmed that "it's not . . . the State's duty to defend Mr. Browne personally or professionally, and we don't intend to do so."

because it concerned only a "short factual pocket."[16] Browne similarly argues that Cloud's claim differs from the usual negligence-based ineffective assistance claim because Cloud alleged that Browne's desire for publicity interfered with his duty to advise Cloud competently. We do not find this allegation sufficiently unique to justify the extraordinary action of making Browne a party. There is no principled basis on which to distinguish this motion from the many posttrial and postplea motions brought every year in which some third party has an interest. The trial court erred in allowing Browne to intervene.

We must next decide whether Browne's intervention prejudiced Cloud. The State contends that even if Browne's intervention were improper, any error which occurred was harmless. We cannot agree. At the hearing, the witnesses and expert testimony focused on what, exactly, Browne had advised the Clouds and others about the possible outcomes of the trial, and whether or not this advice breached the standard of a reasonably competent attorney.[17] The trial court recognized that because "a thorough examination of the factual evidence and expert opinion interconnects with the prejudice prong," this was not a case which could be resolved by conducting a prejudice analysis and avoiding the question of whether the attorney's advice was competent. The State indicated that Browne and Cloud would be responsible for presenting the facts and it did not "know how much [it would] participate" in this fact-finding process. After Browne and Cloud established the factual basis, the State anticipated it would "have a position."

After thorough consideration of the evidence, the trial

---

[16]The hearing focused, however, on the entire period of Browne's representation of Cloud.

[17]This is the first prong of the *Strickland v. Washington* test. There, the Supreme Court set forth the rule for proving ineffective assistance of counsel. The defendant must first prove by a preponderance of the evidence that his attorney's actions failed to meet the standard of a reasonably competent attorney. If the defendant sustains this burden, the court must determine, to a reasonable probability, whether without the erroneous advice, the outcome of the trial would have been different. 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

court concluded that even if Browne had competently advised Cloud, he would have nevertheless declined the State's offer. Because this conclusion was based on information and credibility determinations derived from Browne's presentation, Browne's participation undoubtedly affected the outcome of the proceeding. We must therefore remand for another hearing on Cloud's motion for a new trial. And because it would be extremely difficult, if not impossible, for the trial judge who worked so hard on this case to discount everything that transpired in the first hearing, a different judge should preside over the next hearing.

Cloud urges this court to direct the trial court to suppress on remand any evidence which resulted from Browne's participation. But we are not in a position to determine what evidence the State would have presented in Browne's absence. The trial court, which functions as a fact finder, is in a much better position to take whatever measures it deems necessary to ensure that the prejudice inherent in the original hearing is not carried over on remand.

## II. Constitutionality of Initiative 593

Initiative 593, the "Persistent Offender Accountability Act," was in effect when the trial court sentenced Cloud. This initiative, known as the "three strikes" law, makes Cloud, who is a first-time offender, ineligible for early release from prison.[18] Cloud argues that the initiative violates article II of the Washington Constitution because although the initiative ostensibly applies only to persistent offenders, it contains provisions which restrict the rights of first-time offenders as well.

The State did not address the substance of Cloud's challenge, electing instead to argue that because Cloud's entitlement to good time credit is "entirely speculative,"

---

[18]Under the previous law, Cloud could have earned early release ("good time") for up to 15 percent of his sentence.

this issue is not ripe for review.[19] Although we have held that certain sentencing conditions are not ripe until imposed, this issue warrants immediate review because Cloud could suffer significant prejudice if he had to wait until his sentence was substantially complete to bring this challenge. For example, believing Cloud is not entitled to good time credit, the Department of Corrections may not keep accurate records. The inability to accrue good time may also adversely affect Cloud's status in prison and his access to privileges. In addition, the issues raised are primarily legal, do not require further factual development, and the challenged action is final.[20]

■■ Article II, section 19 of the Washington Constitution provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." The purposes of article II, section 19 are to "(1) prevent 'logrolling,' or pushing legislation through by attaching it to other necessary or desirable legislation, and (2) assure that the members of the legislature and the public are generally aware of what is contained in proposed new laws."[21]

■ The ballot title of Initiative 593 states, "Shall criminals who are convicted of 'most serious offenses' on three occasions be sentenced to life in prison without parole?" In *State v. Thorne*, the Washington Supreme Court concluded that because this title "refers only to criminals who have committed serious offenses on three occasions,"[22] the initiative is "restrictive," meaning that "the provisions

---

[19]The State suggests that Cloud file a personal restraint petition after he accumulates good time credit in prison. Although personal restraint petitions must normally be brought within a year of discovery of pertinent facts, there is an exception for constitutional challenges.

[20]This is the ripeness test set forth in *First Covenant Church v. City of Seattle*, 114 Wn.2d 392, 400, 787 P.2d 1352 (1990), *vacated on other grounds*, 499 U.S. 901, 111 S. Ct. 1097, 113 L. Ed. 2d 208 (1991).

[21]*State v. Thorne*, 129 Wn.2d 736, 757, 921 P.2d 514 (1996). Article II, section 19 applies to initiative measures. *Thorne*, 129 Wn.2d at 757.

[22]*State v. Thorne*, 129 Wn.2d 736, 758, 921 P.2d 514 (1996).

which are not fairly within it will not be given force."[23] The court conducted this analysis in response to a challenge identical to Cloud's, but because the defendant in *Thorne* was a persistent offender and clearly covered by the initiative, the *Thorne* court stated that it "need not decide whether the part of the Initiative which concerns early release is beyond the scope of the ballot title . . . ."[24] The court did, however, suggest that any parts of the initiative which do not relate to persistent offenders were not legitimately included: "The ballot title to Initiative 593 contains only one subject, persistent offenders; hence, any provisions in the law which relate to that subject are valid under article II, section 19." Implicit in this statement is that Initiative 593 provisions which are unrelated to persistent offenders are invalid, and accordingly, should be stricken.[25] We hold that RCW 9.94A.120(4) violates article II, section 19 of the Washington Constitution and cannot be enforced.[26] Because Cloud was sentenced under this unconstitutional provision, we remand for imposition of a sentence which permits Cloud early release, and direct the trial court to credit Cloud with good time credit he has already earned.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

GROSSE and COX, JJ., concur.

---

[23]*Id.* In contrast, general ballot titles "will be given a liberal construction."

[24]*Id.* at 758.

[25] " '[I]f only one subject is embraced in the title, then any subject not expressed in the title that is embraced in the body of the act, may be rejected, and the part that is expressed in the title be allowed to stand . . . .' " *Power, Inc. v. Huntley*, 39 Wn.2d 191, 200, 235 P.2d 173 (1951) (quoting *Jackson v. State ex rel. South Bend Motor Bus Co.*, 194 Ind. 248, 258, 142 N.E. 423 (1924)).

[26]In 1997, the Legislature reenacted RCW 9.94A.120 under a more expansive title. We express no opinion about the validity of the reenacted statute.

Reconsideration granted and opinion modified June 28, 1999.