225 P.3d 956 (2010)
STATE of Washington, Respondent,
v.
A.N.J., Appellant.
No. 81236-5.
Supreme Court of Washington, En Banc.
Argued May 21, 2009.
Decided January 28, 2010.
*958 George M. Ahrend, Garth Louis Dano, Dano Gilbert & Ahrend PLLC, Moses Lake, WA, for Appellant.
D. Angus Lee, Grant County Prosecuting Attorney, Carole Louise Highland, Attorney at Law, Grant County Prosecuting Attorney Office, Ephrata, WA, for Respondent.
CHAMBERS, J.
¶ 1 In 2004, when A.N.J.[1] was 12 years old, he pleaded guilty to first degree child molestation. Almost immediately, he moved to withdraw his plea upon realizing his juvenile sex offense criminal history would remain on *959 his record once he was an adult, that he might have to register as a sex offender for the rest of his life, that he would have to notify his school, and that he would probably be shadowed by an adult while he was at the school. A.N.J. contends his court appointed counsel was ineffective because he failed to do an adequate investigation, failed to consult with experts, failed to fully inform him of the consequences of his plea, and failed to form a confidential relationship with him independent of his parents. He also argues that the trial judge did not adequately confirm that he understood the elements of the crime. He argues that under the facts of this case, his plea was not knowing, voluntary and intelligent, and that he should have been allowed to withdraw it. We conclude several of A.N.J.'s contentions have merit and remand to the trial court with directions that A.N.J. be allowed to withdraw his plea.
¶ 2 The right of effective counsel and the right of review are fundamental to, and implicit in, any meaningful modern concept of ordered liberty.[2] More than 45 years ago Clarence Earl Gideon told his trial judge, "`The United States Supreme Court says I am entitled to be represented by Counsel.'" Gideon v. Wainwright, 372 U.S. 335, 337, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (quoting transcript). The trial judge disagreed, and without counsel at his side, Gideon was convicted and sentenced to five years in prison. The United States Supreme Court granted Gideon's handwritten petition and concluded that the right to appointed counsel was implicit in the Bill of Rights. Gideon, 372 U.S. at 337 n. 1, 344, 83 S.Ct. 792.
¶ 3 The Bill of Rights is part of our founding compact. It promises everyone certain fundamental rights, including the right not to be put in jeopardy of the loss of life or liberty without due process of law, not to be subject to unreasonable searches and seizures, not to be induced to self incrimination, and not to be put twice in jeopardy for the same offense. U.S. Const. amends. IV-VI, XIV; see also Wash. Const. art. I, §§ 3, 9, 22. Without an attorney, these fundamental rights are often just words on paper. As Justice Black wrote:
[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.... From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.
Gideon, 372 U.S. at 344, 83 S.Ct. 792. The United States Supreme Court held that Gideon was entitled to a new trial and that under the Sixth and Fourteenth Amendments, states were required to appoint counsel for indigent accused, like Gideon before they could lawfully hale men and women into court and subject them to the penalties of the law. Id. at 343-44, 83 S.Ct. 792. Since Gideon, the high court has found that the right to counsel extends to children and in misdemeanor prosecutions whenever the defendant faces a risk of loss of liberty. Argersinger v. Hamlin, 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); In re Gault, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Later, in Strickland, the Supreme Court made clear that the Constitution guaranteed the poor not just an appointment of counsel, but also effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
*960 ¶ 4 Yet 45 years after Gideon, we continue our efforts to fulfill Gideon's promise. While the vast majority of public defenders do sterling and impressive work, in some times and places, inadequate funding and troublesome limits on indigent counsel have made the promise of effective assistance of counsel more myth than fact, more illusion than substance. Public funds for appointed counsel are sometimes woefully inadequate, and public contracts have imposed statistically impossible case loads on public defenders and require that the costs of experts, investigators, and conflict counsel must come out of the defenders' own already inadequate compensation. See Gene R. Nichol, The Charge of Equal Justice, JUDGES' J., Summer 2008, at 38 & 41 n. 12 (citing Deborah Rhode, In the Interests of Justice: A Comparative Perspective on Access to Legal Services and Accountability of the Legal Profession, 56 CURRENT LEGAL PROBS. 93, 96-98 (2003)); THE CONSTITUTION PROJECT, JUSTICE DENIED: AMERICA'S CONTINUING NEGLECT OF OUR CONSTITUTIONAL RIGHT TO COUNSEL 53, 57, 64, 67-68 (2009); Ex. 13, at 7-8 (Am. Decl. of John A. Strait). Such public contracts for public defenders discourage appropriate investigation, testing of evidence, research, and trial preparation, and literally reward the public defender financially for every guilty plea the defender delivers. Such public defender systems have been called "`meet `em, greet `em and plead `em'" justice. Deborah L. Rhode, Access to Justice, 69 FORDHAM L. REV 1785, 1793 & n. 42 (2001) (citing Alan Berlow, Requiem for a Public Defender, AM. PROSPECT, June 5, 2000, at 28). It is clear, even if not calculated, that the prosecution benefits from a system that discourages vigorous defense and creates an economic incentive for indigent defense lawyers to plea bargain.[3]
¶ 5 This case challenges the constitutional adequacy of the prior indigent criminal defense that was provided by Grant County under a previous public defender contract.[4] Since this case, public defense in Grant County was reorganized and improved in response to changes to the Rules of Professional Conduct that addressed several of the troublesome structural components of the system.

A.N.J.
¶ 6 On April 7, 2004, Deputy Matney received a report that five-year-old T.M. of Moses Lake had been sexually molested by another child. On May 3, Deputy Matney interviewed T.M., who reported that his neighbor, A.N.J., had touched him and his four-year-old sister "over and under [their] clothing." Clerk's Papers (CP) at 1, 21-23.
¶ 7 Eleven days later, the deputy called A.N.J.'s parents. Apparently, after speaking with an unnamed attorney, A.N.J.'s parents agreed to have their son talk to the police. According to A.N.J., five-year-old T.M. had attempted to instigate a game of "Icky Poke-U," which, it seems, involves putting one's hands down another's pants. A.N.J. told the deputy he had declined to play and had touched neither child. The deputy noted in his report that he did not believe A.N.J. because he stopped making eye contact and started crying.
¶ 8 A.N.J. was charged with one count of first degree child molestation under RCW 9A.44.083 and assigned a public defender, Douglas Anderson. Anderson had contracted with Grant County to provide public defender services in juvenile cases, among other things, for a flat fee. A 2000 version of the contract set the fee at $162,000 per year. Under the contract, Anderson was required to pay for "expert witnesses, investigators and other service necessary to an adequate... defense ... except for extraordinary *961 cases." Ex. 8, at 5.[5] Additionally, if conflict counsel was required, it was Anderson's responsibility to notify the court and pay for that counsel out of his flat fee. Under recent revisions of the rules governing attorneys' professional conduct, it is now unethical for an attorney to sign a public defender contract to deliver public defense if the contract requires the attorney to pay for conflict counsel, expert witness, or investigative costs out of a lump fee. RPC 1.8(m). The year he represented A.N.J., Anderson represented 263 clients under this contract. Additionally, he carried an average of 30-40 active dependency cases at any one time, and about another 200 cases. Anderson's only assistant was his wife, who had been home with a sick child at the time he was representing A.N.J.
¶ 9 Anderson filed a notice of appearance on behalf of A.N.J. on July 29, 2004. He met with his 12-year-old client and his client's parents once before the August 2, 2004, arraignment for about five minutes, and then briefly before the arraignment itself. Client and lawyer did not meet again before the pretrial conference on September 14, 2004, though A.N.J.'s father called in weekly. Anderson did little if any investigation or research into the case. Despite being given the names of witnesses who might have been able to testify that the victim had been abused by others, which could have provided an alternative explanation for T.M.'s report and knowledge, Anderson called these witnesses only once, did not reach them, and did not follow up. He never spoke to the investigating officer. He made no requests for discovery and filed no motions. At the pretrial conference, Anderson spent 5 to 10 minutes with A.N.J. and his parents.
¶ 10 The day after the pretrial conference, the State offered a deal. If A.N.J. would plead guilty to one count of first degree child molestation, the State would recommend a special sex offender disposition alternative program (SSODA). If A.N.J. successfully finished treatment, the charge would be reduced to second degree child molestation. Anderson believed the State's offer was a good deal and would have the added benefit to A.N.J. that he would not be charged with molesting T.M.'s younger sister.
¶ 11 On September 17, 2004, Anderson met with A.N.J.'s family to discuss the plea offer. Before this meeting, the evidence suggests Anderson had met with A.N.J. three times and spent somewhere between 20 and 30 minutes with them. A.N.J.'s parents estimated 5 to 10 minutes. CP at 119 (5 minutes), 122, 193 (10-20 minutes); Hr'g Tr. (Sept. 14, 2004) (5 minutes). At first, Anderson testified that he had a copy of the plea agreement at the September 17 meeting but later admitted that he did not.[6] Anderson testified that he spent "well over a half hour" discussing the plea offer. A.N.J.'s parents estimated it was between 5 and 10 minutes. CP at 32, 177. On September 22, just before the plea hearing, A.N.J. saw the plea documents for the first time. Anderson estimated that he saw A.N.J. for only about 5 minutes before the plea hearing. Anderson did not read the entire statement on plea to A.N.J.; instead he "just explained a couple of brief things regarding registering as a sex offender and the fact that [A.N.J.] could not own a firearm or have contact with the victim." CP at 35. The statement on the guilty plea recites the elements of the crime and gives the standard range sentence as 15-36 weeks. It also says that A.N.J. must register as a sex offender, though it says nothing about whether there is, or is not, the possibility of having the registration requirement removed. The box next to "school notification" is not checked.
*962 ¶ 12 Based on Anderson's testimony as a whole, it appears that he spent as little as 55 minutes with A.N.J. before the plea hearing, did no independent investigation, did not carefully review the plea agreement, and consulted with no experts.[7] Based upon the testimony of A.N.J.'s parents, Anderson spent between 35 and 40 minutes with their son before the plea.
¶ 13 A.N.J. did not make a statement at his plea hearing. The judge reviewed the record and found that there was a factual basis to accept the plea. Before accepting the plea, the judge asked A.N.J. if his attorney had read him the statement, whether he understood it, whether he understood that he could serve up to 36 weeks, not attend the same school as the victim, have to pay a fine, and register as a sex offender. A.N.J. said that he did. A.N.J. also said he had no questions. The judge did not review the elements of the crime with A.N.J. on the record. The trial judge checked a box on the form that said "The Respondent asserted that ... [t]he respondent's lawyer has previously read to [him] the entire statement above and that [he] understood it in full." CP at 11.
¶ 14 In November 2004, A.N.J. hired a new lawyer and within five weeks moved to withdraw his guilty plea. His parents submitted declarations in support stating that Anderson had not contacted any of the witnesses they supplied, did not return their calls, and met with them only briefly. His mother also said that she "specifically asked Mr. Anderson when this charge would be dropped from [A.N.J.'s] record." According to A.N.J.'s mother, Anderson said, "`the laws change every year and I'll have to look into it, but it can be done either when [A.N.J.] turns eighteen (18) or twenty-one (21).'" CP at 29; see also CP at 32 (father's similar declaration). Both parents testified they were not told that A.N.J.'s school would be informed or what the SSODA would entail. A.N.J. did not testify or submit a declaration. Anderson also initially submitted a declaration in support of A.N.J.'s motion. He acknowledged he had done no investigation, that he had not read the plea agreement to A.N.J. or had him do so, and that he had told A.N.J.'s parents that he "believed" the convictions could be removed from A.N.J.'s record when he turned 18 or 21.[8]
¶ 15 However, in a subsequent declaration and at the hearing on A.N.J.'s motion to withdraw his plea, Anderson waffled on his signed declaration. A.N.J. unsuccessfully moved to limit Anderson's testimony on the ground that he had not generally waived attorney/client privilege. The judge concluded that A.N.J. had completely waived attorney/client confidentiality by moving to withdraw his guilty plea based on ineffective assistance of counsel.[9] During the hearing, *963 Anderson acknowledged that he probably did not review the mandatory minimum sentence with A.N.J., or the requirement that he inform his school that he was a sex offender. Anderson also acknowledged that he did not talk to the investigating officers himself and had not used an investigator during the contract year. However, he denied misleading A.N.J. about the consequences of the plea.[10]
¶ 16 A.N.J. also assembled experts. Dr. Tasha Boychuk-Spears, an expert in interviewing children, submitted a declaration stating that the police detective's investigation was "insufficient" in a variety of ways, mostly because it did not take into account the suggestibility of young children. CP at 39. Seattle University Law Professor John A. Strait also submitted a declaration and testified pro bono as an expert witness in support of allowing A.N.J. to withdraw his plea. Professor Strait flatly concluded that Anderson's representation did not meet Sixth Amendment standards because, among other things, he did not do an adequate investigation, did not develop a rapport with A.N.J. individually, and did not spend sufficient time.
¶ 17 The court was not impressed. The trial judge did not explicitly reach in his ruling whether A.N.J. had been misinformed that the child molestation conviction could ever be stricken from his record. He found that A.N.J. had acknowledged the facts. CP at 209 ("It's my finding that the parents as well as the child accepted the position, the factual position of the State."). The judge did find that A.N.J. was not informed that he would be shadowed while at school, but concluded that was a collateral consequence that did not justify withdrawing a plea. He also explicitly found that A.N.J. had not shown ineffective assistance of counsel. At sentencing, which took place on August 29, 2006, the prosecutor did not recommend a SSODA, on the ground that "[A.N.J.] has not evidenced amenability to that type of alternative disposition." Transcript of Proceedings (Tr.) (July 22, 2005 & Aug. 29, 2006) at 18. The record suggests that A.N.J. had declined to be evaluated for SSODA pending final resolution on his motion to withdraw his guilty plea. Nearly two years after his plea, A.N.J. was sentenced to 15-36 weeks in custody, required to undergo HIV (human immunodeficiency virus) and DNA (deoxyribonucleic acid) testing, and to register as a sex offender. The Court of Appeals affirmed.

MOTION TO WITHDRAW THE PLEA
¶ 18 A.N.J. sought, and the trial judge denied, a motion to withdraw his guilty plea. Generally, we review this decision for abuse of discretion. State v. Marshall, 144 Wash.2d 266, 280, 27 P.3d 192 (2001) (citing *964 State v. Olmsted, 70 Wash.2d 116, 422 P.2d 312 (1966)). Under the criminal rules, "[t]he court shall allow a defendant to withdraw the defendant's plea of guilty whenever it appears that the withdrawal is necessary to correct a manifest injustice." CrR 4.2(f). A.N.J. stresses that he moved to withdraw his plea immediately upon learning that his juvenile conviction of a sex offense would stay on his record for the rest of his life. Before the adoption of CrR 4.2(f), this court followed a dual standard for the withdrawal of pleas. A more liberal standard was applied if the defendant moved to withdraw before sentencing. Former RCW 10.40.175 (1881), repealed by LAWS of 1984, ch. 76, § 27, provided, "At any time before judgment, the court may permit the plea of guilty to be withdrawn, and other plea or pleas substituted." The motion was addressed to the sound discretion of the court, "to be exercised liberally in favor of life and liberty." State v. Hensley, 20 Wash.2d 95, 101, 145 P.2d 1014 (1944) (citing State v. Cimini, 53 Wash. 268, 101 P. 891 (1909)). Following the adoption of CrR 4.2(f), we abandoned the dual standard in favor of a singular, and more stringent, standard of allowing "`a defendant to withdraw his plea of guilty whenever it appears that the withdrawal is necessary to correct a manifest injustice.'" State v. Taylor, 83 Wash.2d 594, 595, 521 P.2d 699 (1974) (quoting CrR 4.2(f)). We adopted the uniform standard because an examination of other rules connected to CrR 4.2(f) "prevents a court from accepting a plea of guilty until it has ascertained that it was `made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea.'" Taylor, 83 Wash.2d at 596, 521 P.2d 699 (quoting CrR 4.2(d)).[11] However, a claim by a defendant that he did not understand the consequences of his plea may simply be more credible if made before sentencing than it would be if the defendant rolls the dice on a favorable sentence and is disappointed. We adhere to the single manifest injustice standard. But the timing of a motion may be considered by the court together with all other evidence bearing on the issue. However, the timing of the motion should be given weight only when it is made promptly after discovery of the previously unknown consequences or the newly discovered information. Timing should be given particular weight if the motion is made before any other benefit to the defendant or detriment to the State is known, and if the motion is grounded in the core concerns recognized in Taylor, whether the plea was voluntary, knowingly and intelligently made, and made with an understanding of the nature of the charge and the consequences of the please. See generally id.

SUFFICIENCY OF THE EVIDENCE
¶ 19 A.N.J. begins his task of demonstrating manifest injustice by challenging the sufficiency of the evidence for several of the court's findings at the hearing on the motion to withdraw his plea. We review such challenges for substantial evidence. Soltero v. Wimer, 159 Wash.2d 428, 433, 150 P.3d 552 (2007) (citing Nordstrom Credit, Inc. v. Dep't of Revenue, 120 Wash.2d 935, 942, 845 P.2d 1331 (1993)). A.N.J. bears the burden of showing that there is not sufficient evidence to persuade a reasonable person of the trial judge's findings. Nordstrom, 120 Wash.2d at 939-40, 845 P.2d 1331 (citing Grein v. Cavano, 61 Wash.2d 498, 507, 379 P.2d 209 (1963)).
¶ 20 Several of the trial court's findings flow from its finding that A.N.J. "accepted the State's version of the alleged facts." CP at 215 (Finding of Fact (FOF) 10). This finding is not consistent with anything that A.N.J. himself said or did at any point in the proceedings other than making the plea itself. A.N.J. did not make a statement at the plea hearing. The trial court relied upon the police report, which said among other things that A.N.J. insisted that he declined to play "Icky Poke-U" and had touched neither child. Nor is the finding supported by the statements of A.N.J.'s parents or by any statement made by A.N.J. *965 when his plea was admitted. The strongest supporting evidence is Anderson's declaration that A.N.J. "began to admit" the conduct and that his father accepted it. Ex. 3. But Anderson failed to elaborate on what "began to admit" meant. Substantial evidence does not support the finding of fact.
¶ 21 The trial judge also found that A.N.J. initiated the conduct with the victim. There is no evidence in the record of this. A.N.J.'s father's testified that he believed the victim initiated the conduct. The State contends without specific citation that the transcript of the officer's discussion with the victim establishes that A.N.J. initiated the conduct, but we find nothing in the transcript sufficient to support this finding.
¶ 22 A.N.J. challenges the trial court's finding that he "possessed the requisite intent." CP at 215 (FOF 10). This finding may follow reasonably from the judge's findings that A.N.J. accepted the State's versions of the facts and initiated the contact. But there is no direct evidence anywhere that A.N.J. had the requisite intent and there is significant reason to doubt he did. As discussed below, from the record, A.N.J. might easily have believed that the mere contact alone was sufficient to support a child molestation charge, not that the State had to prove the contact was for sexual gratification. State v. Lorenz, 152 Wash.2d 22, 33, 93 P.3d 133 (2004).
¶ 23 Finally, A.N.J. challenges the trial court's factual finding that his plea was knowing, voluntary, and intelligent. To the extent that is a factual finding, there is very little evidence for it; to the extent that it is a legal one, it will be discussed below.

INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 24 Most of A.N.J.'s challenges are to the effectiveness of his counsel's representation. He bears the burden of showing that (1) his counsel's performance fell below an objective standard of reasonableness and, if so, (2) that counsel's poor work prejudiced him. State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995); Strickland, 466 U.S. at 688, 104 S.Ct. 2052. While generally the trial judge's decision on whether to allow a defendant to withdraw a guilty plea is reviewed for abuse of discretion, "[b]ecause claims of ineffective assistance of counsel present mixed questions of law and fact, we review them de novo." In re Pers. Restraint of Fleming, 142 Wash.2d 853, 865, 16 P.3d 610 (2001) (citing State v. S.M., 100 Wash. App. 401, 409, 996 P.2d 1111 (2000)).

1. ADEQUACY OF INVESTIGATION
¶ 25 A.N.J. challenges the adequacy of Anderson's investigation and his failure to consult with an expert witness. Anderson did no meaningful investigation. He called two witnesses provided by A.N.J.'s parents who might have testified that the complaining witness had been sexually abused before making these allegations against A.N.J. When he did not reach them on his first try, it appears he made no follow up attempts. While no binding opinion of this court has held an investigation is required, a defendant's counsel cannot properly evaluate the merits of a plea offer without evaluating the State's evidence. See State v. Bao Sheng Zhao, 157 Wash.2d 188, 205, 137 P.3d 835 (2006) (Sanders, J., concurring).
¶ 26 The Washington Defender Association (WDA) has established standards for adequate representation. See WDA, STANDARDS FOR PUBLIC DEFENSE SERVICES std. 6 & cmt at 52-53 (2006).[12] The State essentially argues that we should not consider these standards because they have not been adopted by the court. We disagree. We accept the State's point that professional standards do not establish minimum Sixth Amendment standards. Cf. Helling v. Carey, 83 Wash.2d 514, 518-19, 519 P.2d 981 (1974) (quoting Texas & Pac. Ry. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 (1903)). "`Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.'" Id. at 519, 519 P.2d 981 (emphasis omitted) (quoting The T.J. Hooper, 60 F.2d 737, 740 (2d *966 Cir.1932)). However, while not binding, relevant standards are often useful to courts in evaluating things like effective assistance of counsel. See, e.g., In re Pers. Restraint of Brett, 142 Wash.2d 868, 879-80, 16 P.3d 601 (2001). We note that state law now requires each county or city providing public defense to adopt such standards, guided by standards endorsed by the Washington State Bar Association. RCW 10.101.030; see also WASH. STATE BAR ASS'N, STANDARDS FOR INDIGENT DEFENSE SERVICES (Sept. 20, 2007). While we do not adopt the WDA Standards for Public Defense Services, we hold they, and certainly the bar association's standards, may be considered with other evidence concerning the effective assistance of counsel.
¶ 27 The State essentially argues that Anderson, categorically, had no duty to investigate once he believed his client "began to admit" guilt. We disagree. First, we have already held that the failure to investigate, at least when coupled with other defects, can amount to ineffective assistance of counsel. In re Brett, 142 Wash.2d at 882-83, 16 P.3d 601. Second, and more importantly, the fact that Anderson seemed to believe that his client was going to confess, or even was guilty, was not enough to excuse some investigation. False confessions (especially by children), mistaken eyewitness identifications, and the fallibility of child testimony are well documented. See Richard A. Leo et al., Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century, 2006 Wis. L. REV. 479, 480-85 (2006) (discussing the false confessions by juveniles to the Central Park jogger case); Steven A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C. L. REV. 891, 904 (2004); Bernal v. People, 44 P.3d 184, 190 (Colo.2002) (discussing fallibility of eyewitness testimony). A criminal defense lawyer owes a duty to defend even a guilty client. RPC 3.1; WDA, supra, at 9; AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE PROSECUTION FUNCTION AND DEFENSE FUNCTION 4-41(a) (3d 1993).[13] Counsel has a duty to assist a defendant in evaluating a plea offer. RPC 1.1 ("A lawyer shall provide competent representation to a client. Competent representation requires ... thoroughness and preparation reasonably necessary for the representation"); RPC 1.2(a) ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea." (emphasis added)); State v. Osborne, 102 Wash.2d 87, 99, 684 P.2d 683 (1984) (citing State v. Cameron, 30 Wash.App. 229, 232, 633 P.2d 901 (1981)). Effective assistance of counsel includes assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial. S.M., 100 Wash.App. at 413, 996 P.2d 1111. The degree and extent of investigation required will vary depending upon the issues and facts of each case, but we hold that at the very least, counsel must reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty.[14]
¶ 28 A.N.J. also argues the Grant County public defender contract in place at the time created an incentive for attorneys not to investigate their clients' cases or hire experts. We agree. Entering such contracts *967 is now a violation of the Rules of Professional Conduct. RPC 1.8(m). The system effectively paid a bounty for every guilty plea delivered by assigned defense counsel to the county prosecutor. This was a dysfunctional system. We do not, at this time, go so far as the Arizona Supreme Court in holding that the system itself violates a defendant's constitutional rights to due process and right to counsel. Cf. State v. Smith, 140 Ariz. 355, 362, 681 P.2d 1374 (1984) (finding somewhat similar system of public defense constitutionally defective). However, we hold that if a public defender contract requires the defender to pay investigative, expert, and conflict counsel fees out of the defender's fee, the contract may be considered as evidence of ineffective assistance of counsel. We further hold that depending on the nature of the charge and the issues presented, effective assistance of counsel may require the assistance of expert witnesses to test and evaluate the evidence against a defendant.

2. ATTORNEY'S DUTY TO FORM CONFIDENTIAL RELATIONSHIP WITH CLIENT
¶ 29 A.N.J. was always accompanied by his parents when he met with Anderson. Citing Washington State Bar Association (WSBA), American Bar Association (ABA) and local defense bar standards, A.N.J. criticizes Anderson for not meeting with him privately and creating a confidential attorney/client relationship with him. A.N.J. contends that the WSBA standards have been incorporated by reference into Washington statutes, which currently state that "The standards endorsed by the Washington state bar association for the provision of public defense services should serve as guidelines to local legislative authorities in adopting standards." RCW 10.101.030. That is a strong reading of the text. At the time that A.N.J. pleaded guilty, the statute merely said that bar endorsed standards "may serve as guidelines." Laws of 1989, ch. 409, § 4. We conclude that the professional standards are evidence of what should be done, no more.
¶ 30 Professor Strait condemned the constant presence of A.N.J.'s parents in both his declaration (attached to the petitioner's supplemental brief) and in testimony at the motion hearing itself. A child, it is argued, may be more candid with his lawyer and more willing to express his own view if his parents are not present. Professor Strait contends, among many other things, that "[c]andor cannot be accomplished ... when the meeting is held jointly with the parents. There is a substantial risk that the child defer to the parents under such circumstances when advice on the decision to plead guilty or to go to trial is being provided." Ex. 13, at 11-12 (Am. Decl. of John A. Strait). Thus, he suggests, by failing to establish a confidential relationship with A.N.J., Anderson undermined the attorney/client relationship, undermined client autonomy, and potentially waived attorney/client privilege. Id. A juvenile client should be given the opportunity to consult with and confide in his attorney without his parents present. We hold that the failure to provide that opportunity to a juvenile defendant is a factor that may be considered by a court when considering whether a plea was knowingly, voluntarily, and intelligently made but is not dispositive in this case.

CONSEQUENCES OF GUILTY PLEA
¶ 31 A defendant "must be informed of all the direct consequences of his plea prior to acceptance of a guilty plea." State v. Barton, 93 Wash.2d 301, 305, 609 P.2d 1353 (1980). Again, A.N.J. largely bases his claim on ineffective assistance of counsel. While a defendant cannot be positively misinformed about the collateral consequences, those collateral consequences can be undisclosed without rendering the plea involuntary. "The distinction between direct and collateral consequences of a plea `turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment.'" Id. (quoting Cuthrell v. Director, Patuxent Inst., 475 F.2d 1364, 1366 (4th Cir.1973)). A.N.J. argues that he should be allowed to withdraw his guilty plea because, he contends, his counsel misled him about the consequences of his plea.
¶ 32 The trial judge made no relevant findings, perhaps because he believed that *968 A.N.J.'s challenge went to the registration requirement and that the registration requirement was merely a collateral consequence of a guilty plea. This court has never held that a preexisting automatic statutory requirement of sex offender registration is not a direct consequence of a plea, though we decided a related but different issue in State v. Ward, 123 Wash.2d 488, 513-14, 869 P.2d 1062 (1994). Ward challenged the sex offender registration statute itself, which imposed a registration obligation on people convicted long before it was enacted. See id. Several offenders who had either pleaded guilty or had been convicted of sex offenses before the registration statute was enacted challenged the registration obligation on constitutional grounds. The State argued, among other things, that the registration requirement was not ex post facto and need not be in place at the time the plea (or conviction) was entered. We agreed that the postconviction registration requirement did not violate the constitution:
[W]e conclude there was no constitutional requirement to advise Doe of his duty to register as a sexual offender at the time of his guilty plea. Although the duty to register flows from Doe's conviction for a felony sex offense, it does not enhance Doe's sentence or punishment. "A defendant must understand the sentencing consequences for a guilty plea to be valid." (Italics ours.) State v. Miller, 110 Wash.2d 528, 531, 756 P.2d 122 (1988). As we concluded under our ex post facto analysis, registration as a sex offender does not alter the standard of punishment. Because registration as a sex offender does not alter the standard of punishment, we hold the duty to register is collateral, and not a direct, consequence of a guilty plea.
Id. at 513-14, 869 P.2d 1062. Ward considered a statutory consequence that came into existence only after the conviction, not an existing, automatic statutory consequence. Under existing statutes, the obligation to register follows directly from the conviction. E.g., RCW 9A.44.130. While the registration obligation does not affect the immediate sentence, its impact is significant, certain, and known before a guilty plea is entered. A.N.J. argues that he was misled as to both the direct and collateral consequences of his plea, but since he was correctly informed that he had an obligation to register as a sex offender, it is unnecessary for us to decide whether a current statutory duty to register as a sex offender is a direct consequences of a plea for the purposes of establishing whether a plea was involuntarily made.
¶ 33 A person convicted of a sex crime can petition to be relieved of the obligation to register. RCW 9A.44.140. Anderson says he told A.N.J. and his parents that "up to the discretion of the court ... he could have the requirements to register as a sex offender removed" when he was 18 or 21. CP at 29, 164. Broadly speaking, that is the case; but the process is conditional and discretionary.[15] However, under current law, the record of juvenile sex offenses never goes away. RCW 9.94A.525(2); cf. In re Pers. Restraint of LaChapelle, 153 Wash.2d 1, 4, 100 P.3d 805 (2004) (discussing prior times when juvenile offenses did wash out). The record of A.N.J.'s conviction of a juvenile sex offense will remain with him the rest of his life.
¶ 34 The failure to advise A.N.J. that the juvenile sex conviction would remain on his record forever, in and of itself, would not rise to a manifest injustice. See, e.g., *969 State v. Oseguera Acevedo, 137 Wash.2d 179, 195, 970 P.2d 299 (1999). But if A.N.J. was misinformed that his conviction could be removed from his record, then he should be allowed to withdraw his plea. State v. Stowe, 71 Wash.App. 182, 188, 858 P.2d 267 (1993) (When there are "additional consequences of an unquestionable serious nature ..., it may be manifestly unjust to hold the defendant to his earlier bargain."); State v. McCollum, 88 Wash.App. 977, 982, 947 P.2d 1235 (1997).
¶ 35 The record establishes that Anderson allowed A.N.J. and his parents to have an erroneous understanding that his juvenile conviction as a sex offender could be removed from his record and failed to adequately distinguish between the registration requirement and A.N.J.'s criminal record. See Ex. 3, at 3. Earlier, Anderson remembered "some confusion when A.N.J.'s parents asked when the charge could be removed from A.N.J.'s record." CP at 35. Anderson's original signed declaration said he told the parents he "believed" the conviction would be removed from A.N.J.'s record when he was 18 or 21, and A.N.J.'s parents testified consistently. CP at 29, 32 (parents' declarations).[16] Anderson further declared he "never ... advise[d] [A.N.J. and his parents] further regarding their question" and "never ... fully explained it to them." CP at 35. Anderson's subsequent testimony that sex offenses could not be "sealed up," "but that he could have the requirements to register as a sex offender removed" hardly added clarity to the issue. CP at 164. Importantly, the record reflects that A.N.J. and his parents simply did not understand the difference between registration as a sex offender and the record of a conviction.
¶ 36 Anderson spent precious little time with his client considering the gravity of the charges against A.N.J. A conviction as a juvenile sex offender will have a significant impact on his life. Taken together, the contractual constraints under which Anderson was working, the limited time he spent with his client before the plea, the fact he did not return A.N.J.'s parents' phone calls, the limited time he spent with A.N.J. to go over the statement on plea, A.N.J.'s prompt motion to withdraw his plea upon discovering the consequences of the plea, Anderson's declaration that there was some "confusion" about when the charge could be removed, and that Anderson "believed" the conviction could be removed from A.N.J. record when he turned 18 or 21, we have no difficulty concluding A.N.J. was misinformed as to the consequences of his plea. He is entitled to withdraw it.

A.N.J.'S UNDERSTANDING OF THE CHARGE
¶ 37 A.N.J. also argues that it was error to deny his motion to withdraw his plea because his plea was not knowing and voluntary because he did not understand the nature of the charges against him. Due process requires that a guilty plea may be accepted only upon a showing the accused understands the nature of the charge and enters the plea intelligently and voluntarily. In re Pers. Restraint of Mendoza Montoya, 109 Wash.2d 270, 277, 744 P.2d 340 (1987); Boykin v. Alabama, 395 U.S. 238, 242-43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Court rules prohibit the court from accepting a plea without first assuring the defendant understood the "nature of the charge and the consequences of the plea" as required by CrR 4.2(d), among other things. A.N.J. was charged with first degree child molestation. Under the statute:
A person is guilty of child molestation in the first degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.
RCW 9A.44.083(1). "`Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire." RCW 9A.44.010(2). Gratification is not an element of the crime. It is part of the definition of *970 sexual contact. Lorenz, 152 Wash.2d at 33, 93 P.3d 133. To satisfy the requirements of CrR 4.2(d) and with exceptions not relevant here, there must be sufficient evidence of a factual basis for the plea for a jury to conclude that the defendant is guilty of the crime charged. Zhao, 157 Wash.2d at 198, 137 P.3d 835 (citing State v. Newton, 87 Wash.2d 363, 370, 552 P.2d 682 (1976)). We agree with the Court of Appeals' reasoning in S.M. and hold that in such cases, there must be evidence in the record that A.N.J. understood the law in relation to the facts and that he understood that mere contact with the genitals of another person was not sufficient for the crime charged.[17]
¶ 38 In the case before us, nothing in the colloquy with the judge shows that A.N.J. understood that the physical act was not itself sexual contact; that it had to be done for sexual gratification. RCW 9A.44.010(2) ("`Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire.") A child's game of "Icky Poke-U" certainly does not necessitate sexual gratification. In addition to the lack of any colloquy with the court, we also conclude that neither the charging documents, the plea document, or other evidence of record shows that A.N.J. understood the meaning of sexual contact. Because the record does not affirmatively disclose that A.N.J. understood that any contact he had with T.M. had to be for sexual gratification to constitute the crime with which he was charged, the court violated his right to due process when it accepted his plea and erred when it denied his motion to withdraw his plea. Cf. S.M., 100 Wash. App. at 409, 996 P.2d 1111.

CONCLUSION
¶ 39 A.N.J. seeks to withdraw his plea largely because of ineffective assistance of counsel and because he was misinformed of the consequences of the plea. To do so, he must establish manifest injustice. While "manifest injustice" has not been definitively defined, this court has clearly held that a defendant may withdraw a guilty plea if it was not knowing, voluntary, and intelligent. "A guilty plea is not knowingly made when it is based on misinformation of sentencing consequences." In re Pers. Restraint of Isadore, 151 Wash.2d 294, 298, 88 P.3d 390 (2004). "Manifest injustice includes instances where ... `the plea was not voluntary' [or] `effective counsel was denied.'" Zhao, 157 Wash.2d at 197, 137 P.3d 835 (quoting Marshall, 144 Wash.2d at 281, 27 P.3d 192).
¶ 40 We conclude that court appointed counsel's representation fell below the objective standard guaranteed by the constitution and that A.N.J. was prejudiced.[18] When asked about the "record," Anderson responded by saying the registration requirement could be removed. This misled A.N.J. to the consequences of his plea. Considering the contractual constraints under which Anderson was working, the limited time he spent with his client before the plea, the fact he spent just a few minutes with A.N.J. to go over the statement on plea, A.N.J.'s prompt motion to withdraw his plea upon discovering the consequences of the plea, and Anderson's declaration that there was some "confusion" about when the charge could be removed and that Anderson "believed" the conviction could be removed from A.N.J.'s record when he turned 18 or 21, we conclude that A.N.J. has *971 established that he was misinformed as to the consequences of his plea.
¶ 41 Due process requires that a guilty plea may be accepted only upon a showing the accused understands the nature of the charge and enters the plea intelligently and voluntarily. CrR 4.2(d) prohibited the court from accepting a plea without first assuring the defendant understood the "nature of the charge and the consequences of the plea." A.N.J. was charged with first degree child molestation. Sexual contact for the purposes of that crime must be done for gratifying sexual desire. RCW 9A.44.010(2). There is nothing in the colloquy with the court, the charging documents, or any other record before this court to show that A.N.J. was informed that mere contact with another was insufficient to constitute the crime. His plea should not have been accepted.
¶ 42 Having concluded that because of ineffective assistance of counsel, A.N.J. was misinformed of the consequences of his plea and was not adequately informed of the nature of the charge against him, we find it unnecessary to reach the remainder of his claims. We reverse and remand to the trial court with directions that A.N.J. be allowed to withdraw his plea.
WE CONCUR: BARBARA A. MADSEN, C.J., result only, SUSAN OWENS, CHARLES W. JOHNSON, MARY E. FAIRHURST, GERRY L. ALEXANDER, RICHARD B. SANDERS, JJ., and PHILIP J. THOMPSON, J.P.Tem.
J.M. JOHNSON, J. (concurring).
¶ 43 Twelve-year-old A.N.J. was charged by information on June 30, 2004, with first degree child molestation for having sexual contact with a six-year-old neighbor. Clerk's Papers (CP) at 1. Douglas Anderson was appointed by Grant County to represent A.N.J. in juvenile court in connection with the charge.[1] CP at 2. Anderson met with A.N.J. on at least three and as many as five occasions prior to A.N.J.'s entry of a plea of guilty on September 21, 2004. CP at 163, 176-77, 200. A.N.J.'s parents were both present during these meetings to participate in the discussion and to help their son understand the proceedings. Anderson separately discussed the case with A.N.J.'s father over the phone several times prior to entry of the guilty plea. CP at 163, 176.
¶ 44 Over the course of these meetings and phone calls, Anderson for the most part provided effective assistance to A.N.J. He advised A.N.J. and his parents of the basic nature of the crime and its elements, the sentence that A.N.J. faced, and the possibility of having that sentence suspended and the charge reduced to second degree child molestation if A.N.J. successfully completed a treatment program. CP at 76, 85, 174, 178, 193. Anderson also discussed with A.N.J. the merits of the offer made by the prosecution. CP at 162. Only after A.N.J. began admitting the alleged misconduct did Anderson counsel him to accept the State's offer, a recommendation that Anderson made after weighing the consequences of the guilty plea against the possibility of keeping A.N.J. out of custody, reducing the charge, and avoiding a second charge for similar conduct involving the victim's younger sister. CP at 184.
¶ 45 In making this recommendation, Anderson explained the basic components of the plea agreement in language comprehensible to a 12-year-old child, including the requirement that A.N.J. register as a sex offender, the limits that would be imposed on A.N.J.'s contact with younger children, the victim, and the victim's siblings, and the firearm restrictions associated with the commission of a felony. CP at 76, 167, 176-79, 196-97, 199. Anderson also described what would happen in the courtroom if A.N.J. pleaded guilty and were advised to respond "yes" when the judge asked him whether he had read the statement on the guilty plea or whether the statement had been read to him. *972 CP at 167-68. Anderson explicitly ensured that his client was making the plea freely and voluntarily. CP at 179. At this point, Anderson believed that he had adequately advised A.N.J. regarding potential outcomes and that A.N.J. had been adequately informed of the nature of the charge. CP at 181.
¶ 46 Anderson learned otherwise a few weeks later when A.N.J. notified him of his desire to withdraw the plea. Pursuant to standard practice, Anderson promptly contacted Brian Barlow, another public defender, to handle the case so as to avoid a conflict of interest. CP at 12, 169, 171.
¶ 47 In other circumstances, these efforts may be found to constitute effective assistance. Here, however, I agree with the majority in its finding that Anderson's performance was deficient in two crucial respects, those being (i) that he misinformed A.N.J. of several consequences of his plea and (ii) that he failed to sufficiently inform A.N.J. of the precise nature of the crime to which he pleaded guilty. Majority at 970. These technical mistakes support the court's finding that A.N.J.'s plea was not knowingly made and therefore was invalid.
¶ 48 Although I concur with the majority in this respect, I write separately to stress the limited nature of the present holding. This case is a rare exception to the strong presumption that plea agreements are valid and enforceable by the courts. See, e.g., State v. Neff, 163 Wash.2d 453, 468, 181 P.3d 819 (2008) ("Washington State has a strong public policy in favor of accepting and enforcing the terms of voluntary plea agreements where they have been entered into knowingly, voluntarily, and intelligently."). It should not be taken to suggest that a juvenile plea agreement can be invalidated whenever a juvenile offender cannot recite the exact meaning of the legal jargon in his plea agreement or claims to have been confused about an aspect of his sentence after verifying his understanding during colloquy with a judge. This case is the exception, not the rule, and its holding should be limited to its particular facts.
¶ 49 Accordingly, I emphasize again that Anderson's representation of A.N.J. was objectively deficient only with respect to the two issues mentioned above that rendered A.N.J.'s plea not knowingly made. For that reason, and that reason alone, A.N.J.'s guilty plea in this case is unenforceable.[2] These two deficiencies are unique to the facts of this case and do not merit the majority's discussion of the ways in which modern public defender contracts have left the guaranty of effective counsel unfulfilled for some criminal defendants. Majority at 959-60. The majority goes too far beyond the bounds of the present case with this discussion and threatens to erode public confidence in our defender system and cast doubt on valid, enforceable juvenile plea agreements.
¶ 50 I concur in a limited holding on this record that A.N.J. did not receive effective assistance of counsel prior to his decision to plead guilty to the charge of first degree child molestation. Because of my reservations about the majority's critique of the State's generally laudable public defense system, as well as concerns about the ramifications on other juvenile plea bargains from an overbroad reading of today's decision, I limit the scope of my agreement to a simple "I concur."
SANDERS, J. (concurring).
¶ 51 I have signed the majority opinion; however, I write separately to urge the judiciary to take a more proactive role to facilitate the appointment of effective counsel for indigent criminal defendants. Here the appointed attorney was obviously out of compliance with the standards endorsed by the Washington State Bar Association referenced in RCW 10.101.030. See Wash. State Bar *973 Ass'n, Standards for Indigent Defense Services (2007), http://www.wsba.org/lawyers/ groups/committee&1fonpublicdefense.htm. Just because a county attempts to balance its budget on the backs of indigent criminal defendants is no reason for the court to facilitate this constitutional violation by appointing lawyers who are not in a position to get the job done. Moreover I would argue violation of these standards by appointed counsel should be regarded as prima facie evidence of ineffectiveness.
¶ 52 State v. Wilson, 144 Wash.App. 166, 181 P.3d 887 (2008), also illustrates the problem. In that case the court appointed the public defender for Asotin County to represent the defendant. The public defender made a request to appoint either a co-counsel or a lead counsel because she had been a member of the bar only two years, had no felony trial experience, and did not have the experience necessary to be sole counsel. "The court denied the motion, expressing concern for the `thousands upon thousands upon thousands of dollars' Asotin County would have to pay if experienced counsel was appointed." Id. at 178, 181 P.3d 887 (quoting Report of Proceedings at 7).
¶ 53 Later in the proceeding, the appointed attorney filed a motion to withdraw based largely on the court's denial of her motion for co-counsel. "She stated she was 'overwhelmed and unable to shoulder this burden alone'" (quoting Clerk's Papers at 107) and "explained that she did not have the resources or experience to deal with a case of this size." Id. at 178-79, 181 P.3d 887. Eighteen days before trial the court appointed co-counsel; however that did not provide a reasonable time for investigation and preparation. The Court of Appeals held: "financial concerns should not be used as a justification for inhibiting the constitutional rights of criminal defendants." Id. at 180, 181 P.3d 887. Although the Court of Appeals did not reach the issue of ineffective assistance of counsel because it reversed the conviction on other grounds, the situation remains most problematic and illustrates a systemic failure.
¶ 54 The judiciary should accept no shortcuts when it comes to discharging its constitutional obligation to appoint effective attorneys to represent indigent criminal defendants. If no such attorney is to be found because adequate funding is not available, then no attorney should be appointed and the case dismissed. It is not up to the judiciary to tax or appropriate funds; these are legislative decisions. However, it is up to the judiciary to facilitate a fair proceeding with effective appointed counsel if there is to be one.
¶ 55 I concur.
NOTES
[1] Under RAP 3.4, we direct the clerks' offices of the superior and appellate courts to replace the petitioner's name with his initials in the caption and other publically available sources associated with this opinion.
[2] As the fundamental principles of professional conduct put it:

The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual and the capacity through reason for enlightened self-government. Law so grounded makes justice possible, for only through such law does the dignity of the individual attain respect and protection. Without it, individual rights become subject to unrestrained power, respect for law is destroyed, and rational self-government is impossible.
Lawyers, as guardians of the law, play a vital role in the preservation of society.
RPC, Fundamental Principles of Professional Conduct.
[3] Those same attorneys who prosecute crimes often provide legal advice to county officials on the public defense contracts. At oral argument, we were informed that the chief deputy prosecuting attorney drafted the contract in question. Wash. Supreme Court oral argument, State v. A.N.J., No. 81236-5 (May 21, 2009), at 40 min., 6 sec., audio recording by TVW, Washington State's Public Affairs Network, available at http: www. tvw.org. The contract that is part of the record has an unsigned signature line for the chief deputy prosecuting attorney.
[4] Twenty-eight states provide full funding for indigent defense; most states provide all or most of the cost of indigent defense. Washington is among 16 states that require local governments to bear a majority of the cost of indigent defense. The Constitution Project, supra, at 53-54.
[5] The contract also provided: "3. Services Other Than Counsel. Reasonable compensation for expert witnesses, investigators and other services necessary to an adequate preparation and presentation of the defense case shall be paid by CONTRACTOR, except for extraordinary cases which call for extraordinary expert testimony and/or investigation." Ex. 8, at 5.
[6] Anderson originally testified that "a few days" before the plea hearing, he "went over the Statement on Plea of Guilty." CP at 176-77 (Tr. of Sept. 2, 2005 hearing). Six months later, Anderson testified that "I didn't have the plea agreement with me on the 17th. I went over the plea agreement with him on the 21st." CP at 77 (Tr. of Mar. 16, 2006 hearing). He acknowledged he spent about five minutes going over the plea agreement with A.N.J. with the plea agreement in hand.
[7] Anderson's estimate of time spent with A.N.J. ranged between 55 and 90 minutes. See Pet. for Review, App. at 18 (calculating total time).
[8] Anderson's declaration included the following:

4. I do remember that [A.N.J.]'s parents gave me names of witnesses to contact. I made an attempt, but never was able to speak with them.
5. I never independently investigated the claims regarding the alleged victim nor do a background check on the family. I simply reviewed the police reports.
6. I did not read "word for word" the statement on plea of guilty to [A.N.J.] or have [A.N.J.] do so. I just explained a couple of brief things regarding registering as a sex offender and the fact that [A.N.J.] could not own a firearm nor have contact with the victim.
9. I do remember some confusion when [A.N.J.]'s parents asked when the charge could be removed from [A.N.J.]'s record. I did not know exactly what the law stated and told them that the laws were changing all the time. I told them that I believed it was 18-21 years of age.
10. I never did research or advise [A.N.J.'s parents] any further regarding their question. I never specifically answered their question or fully explained it to them.
11. [A.N.J.] did not read the Statement on Plea or Guilty. I read some portions of it to him. I told [A.N.J.] that the judge would ask him if he had read it or if I had explained it to him and to say yes.
13. I spent approximately (5) minutes with [A.N.J.] going over his statement just before we were called into court.
CP at 34-35.
[9] The trial judge ruled from the bench, "[i]n my view, when a defendant comes before this court and says: `I want to withdraw my plea and the reason why I want to withdraw my plea is because of conversations and contact with my attorney.' In my view, he has waived his attorney/client privilege completely." CP at 147. The scope of that ruling is questionable under State v. Cloud, 95 Wash.App. 606, 613, 976 P.2d 649 (1999), where the court held an ineffective assistance claim only waives attorney/client privilege to the limited extent necessary to evaluate the claim. But A.N.J. does not challenge it on appeal, perhaps because he also implicitly contends that Anderson's conduct waived any attorney/client privilege. Anderson permitted [A.N.J.]'s parents to come to all of the attorney/client meetings.
[10] Anderson testified:

I advised [A.N.J.'s parents] that sex offenses are not able to be sealed up but that there is, with juveniles, the possibility that they could get the registration requirement removed, and that's where I said I was not completely familiar with the law. That that law was somewhat in flux. There was also, it was kind of up to the discretion of the court, but that he could have the requirements to register as a sex offender removed.
CP at 164. On cross examination, he elaborated:
Anderson: I just briefly discussed with him the fact that he would be required to register as a sex offender and it was somewhere in that range that the question came up about having this matter removed from his record. And I don't remember whether it was through that point or elsewhere and that's where our discussion about whether or not he could have it removed came into play.
Judge: What was your advice about having it removed?
Anderson: My advice was that at this time that sex offenses and Class A felonies were not allowed to be sealed up and, but that the requirement to register as a sex offender could be removed, and that's one of the reasons why I felt his plea of guilty was a good idea, because if he was ... ultimately found guilty of a Child Molestation to the 2nd degree, it would [be] more than likely the court could rule that it was no longer necessary for him to register as a sex offender.
CP at 178-79.
[11] In Taylor, the defendant claimed that new information had come to defense counsel but did not disclose the nature of that information, whether the defendant knew of the information before the plea, or how a manifest injustice would result if the defendant was not permitted to withdraw his plea. Taylor, 83 Wash.2d at 598, 521 P.2d 699.
[12] The standards are available at http://www. defensenet.org/re sources/publications-1/wdastandards-for-indigent-defense (last visited Dec. 17, 2009).
[13] That standard reads:

Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.
Std. 4-4.1(a), available at www.abanet.org/ crimjust/standards.
[14] It has been suggested that under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), defense attorneys have no duty to investigate, and might in fact violate client autonomy by investigating the State's case once the client has decided to plead guilty. Our attention has not been drawn to any particular part of Faretta that supports this proposition. Faretta established that a defendant may knowingly and intelligently waive counsel. Id. at 835-36, 95 S.Ct. 2525. It says nothing about the attorney's duty to provide effective representation.
[15] Under the law:

An offender having a duty to register [for an] offense committed when the offender was a juvenile may petition the superior court to be relieved of that duty. The court shall consider the nature of the registrable offense committed, and the criminal and relevant noncriminal behavior of the petitioner both before and after the adjudication, and may consider other factors.
. . . .
(b) The court may relieve the petitioner of the duty to register for a sex offense ... that was committed while the petitioner was under the age of fifteen if the petitioner (i) has not been adjudicated of any additional sex offenses or kidnapping offenses during the twenty-four months following the adjudication for the offense giving rise to the duty to register, and (ii) proves by a preponderance of the evidence that future registration of the petitioner will not serve the purposes of RCW 9A.44.130, 10.01.200, 43.43.540, 46.20.187, 70.48.470, and 72.09.330.
RCW 9A.44.140(4).
[16] Anderson's second declaration tended to contradict his early one, and he testified that he told A.N.J. the conviction would stay on his record. Ex. 3, at 2-3 (second decl.); CP at 164 (Anderson's testimony).
[17] In S.M., a 12-year-old boy was charged with raping his 9-year-old brother. S.M. admitted he had sexual contact with his brother and pleaded guilty. S.M., 100 Wash.App. at 403, 996 P.2d 1111. S.M.'s counsel met with him only once, just before the plea hearing, and did not review the plea form with S.M. Id. at 404, 996 P.2d 1111. S.M. told the trial judge that he knew what sexual intercourse was, but the trial judge "did not ask what he thought it meant or inquire into his understanding of the nature of the charges." Id. at 415, 996 P.2d 1111. The Court of Appeals reversed the trial court and allowed S.M. to withdraw his plea. Id.
[18] While our description of Anderson's performance is unflattering, our concern is focused on the system he and other public defenders have been asked to work under and we do not mean to suggest any particular ethical violation on his part. The record suggests Anderson believed he acted in the best interest of his client which is evidenced by his willingness to sign a declaration detailing his inadequate performance in support of A.N.J.'s motion to withdraw his plea.
[1] In evaluating an appeal from juvenile court proceedings, we must keep in mind the fact that, although juvenile offenders enjoy many of the same constitutional protections as adult offenders, juvenile rights do differ in a number of noteworthy respects from those of accused adults. See State v. Kuhlman, 135 Wash.App. 527, 533, 144 P.3d 1214 (2006). For example, juveniles do not have the right to a jury trial. See State v. Schaaf, 109 Wash.2d 1, 16-17, 743 P.2d 240 (1987).
[2] Although the majority seems to suggest otherwise in its unsympathetic account of Anderson's work on the case, I cannot conclude that Anderson's representation of A.N.J. was ineffective because of the way he chose to manage the case or because he did not spend a particular number of hours investigating the facts. Majority at 961-62. Decisions regarding the proper amount of time to spend investigating and developing cases and the manner in which to manage them are best left to public defenders and those more familiar with the circumstances of each case than to appellate judges such as ourselves working with a cold record.