FILED
COURT OF APPEALS
DIVISION II

2015 FEB 10 AM 8: 55

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In re Detention of: | No. 44759-2-II |
| DARRELL L. KENT, | |
| Appellant. | UNPUBLISHED OPINION |

Bjorgen, A.C.J. — Darrell Kent appeals from the trial court's order of commitment, entered upon a jury's finding that Kent qualified as a sexually violent predator under RCW 71.09.060. Kent contends that his appointed counsel rendered ineffective assistance during the involuntary commitment proceedings. Specifically, Kent argues that counsel performed deficiently by failing to object to testimony from the State's psychology expert that the expert had consulted with another psychologist before changing his initial calculation of Kent's score on two statistical tools used to assess the likelihood of recidivism among sex offenders. Because Kent fails to establish deficient performance, we affirm.

FACTS

Kent has pled guilty to three sex offenses and admitted to sexual misconduct involving many women and girls,[1] including forcibly raping several 8- to 13-year old girls. Relevant to this appeal, in 1995 Kent pled guilty to rape of a child in the second degree, based on conduct against his stepdaughter, and the court sentenced him to 96 months' confinement.

---

[1] One of these is a 1976 New Mexico conviction for attempted criminal sexual penetration in the third degree, based on conduct against an adult woman. Ex. 2. The other two convictions, discussed below, involved conduct against Kent's daughter and stepdaughter that occurred when both were minors.

Sometime after Kent's 2003 release, his biological daughter disclosed that Kent had also raped her between 1992 and 1995. Based on this accusation the State again charged Kent with rape of a child, and he ultimately entered a negotiated *Alford*[2] plea to second degree child molestation in 2005. The court sentenced him to 84 months' confinement.

Prior to his 2005 incarceration, Kent had spent approximately 18 months in the community. Nothing in the record suggests that he committed any sex offense or otherwise engaged in inappropriate conduct toward women or young girls during that time.

In 2011, while Kent was still in prison, the State petitioned under chapter 71.09 RCW to have him involuntarily committed as a sexually violent predator for the protection of the community. The petition alleged that Kent had been convicted of two crimes qualifying as "sexually violent offenses" under the statute and suffered from "[p]edophilia" and "[a]ntisocial [p]ersonality [d]isorder." Clerk's Papers (CP) at 216-17.

Prior to trial, Kent moved to exclude the State's psychology expert, Dr. Mark Patterson, from testifying to opinions that other, nontestifying experts had reached regarding Kent. The State agreed, and the trial court granted the motion.

At trial, Patterson testified to his diagnoses that Kent suffered from pedophilia and antisocial personality disorder. Patterson also opined that Kent would more likely than not "commit sexually violent offenses in the future if not confined." 2 Verbatim Report of Proceedings (VRP) at 222.

Patterson based his opinion as to future dangerousness in part on two actuarial tools, the "Static-99R" and "Static-2002R." 1 VRP at 169-71. These tools allow an evaluator to assign a numerical score to a particular sex offender based on various fixed characteristics, such as the

---

[2] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

number of convictions, whether the offender used violence, whether the victims included strangers, and the offender's age at the time of release. Each score corresponds to a probability value calculated using statistical research on sex offender recidivism, estimating the likelihood that the offender will be charged with another sex offense within certain time periods.

Patterson had originally calculated Kent's score on the Static-99R as two, corresponding to a 12.2 percent probability that Kent would be charged with another sex offense within 5 years, and a 19.7 percent probability within 10 years. Patterson originally calculated Kent's score on the Static-2002R as four, corresponding to 15.5 percent and 23.5 percent probabilities of subsequent sex offense charges within 5 and 10 years, respectively. Patterson later changed his calculations of Kent's scores to four on the Static-99R and six on the Static-2002R, based on a different interpretation of the actuarial tools' scoring rule regarding the offender's age at the time of release.

Patterson had first, for scoring purposes, based Kent's age at the time of release on the date Kent was scheduled to complete the prison term he was then serving, resulting from the 2005 child molestation conviction involving Kent's biological daughter. He later changed the scoring calculation based on Kent's age when he was released from prison in 2003, after serving the sentence imposed on the child rape conviction involving his stepdaughter. Because research shows that the risk of re-offense tends to decline as the offender ages, the new scores yielded significantly higher estimates of the probability that Kent would incur another sex offense charge if not confined.[3]

---

[3] Patterson's new calculations yielded probabilities that Kent would incur additional sex offense charges within the 5-year and 10-year periods of 20.1 percent and 29.6 percent, respectively, according to the Static-99R, and 24 percent and 33.8 percent according to the Static-2002R. Kent does not challenge the scoring change on its merits.

Based on Kent's opening statement, the State moved prior to Patterson's testimony to prohibit Kent from implying during cross-examination that Patterson had changed his scoring calculations at the request of the deputy prosecutor. The court granted the motion to the extent that Kent could not suggest on cross-examination that Patterson had "agreed" to a request from the deputy prosecutor to change the score, but made clear that Kent could otherwise freely inquire into the reasons for the change. 1 VRP at 74. The record of this discussion shows that Kent's attorney knew by that time that Patterson had finalized his decision to change Kent's score on the two actuarial tools after consulting with Dr. Amy Phenix, an expert who helped develop the tools.

The prosecutor inquired into Patterson's scoring change on direct examination, but did not elicit any testimony that Patterson had consulted with another expert before finalizing the change. Kent's attorney then cross-examined Patterson extensively concerning the change. During cross-examination, the following exchange occurred:

> Q.    Okay. So did you actually look at the 2012 update on scoring the age item before making the change that you made?
> A.    What I did was I consulted with one of the people that you're referring to who's been part of the scoring manual and research having to do with the Static-99, Static-2002, and presented information, consulted with her about the scoring of the item.
> Q.    And you did that over the phone?
> A.    By e-mail.
> Q.    By e-mail? Okay. And you did that in terms of questions that you had about offense cluster and about pseudo recidivism; is that right?
> A.    As it applies in this case.

2 VRP at 277. The prosecutor inquired further into Patterson's consultation with Phenix on redirect, eliciting testimony that Phenix confirmed that Patterson had accurately calculated the later, higher-risk scores. Kent did not object to this testimony.

After the State rested, Kent presented the testimony of Luis Rosell, a licensed psychologist who has extensive experience working with sex offenders. Rosell had calculated Kent's scores on the two actuarial tools using the later release date, resulting in the same numbers as Patterson's initial, lower-risk calculation. Over the State's hearsay objection, Rosell testified that, after learning that Patterson had changed scores, Rosell consulted with "one of the people who you can send e-mails to" with scoring questions about the Static-99R and Static-2002R, a Dr. Jan Looman, but did not change his score as a result of the consultation. 3 VRP at 401-03. Dr. Looman is a researcher on psychopathy and recidivism, and the chief psychologist of a sex offender treatment center in Canada.

Outside the presence of the jury, Kent requested the trial court's permission to have Rosell testify in more detail regarding his consultation with Looman on redirect, pointing out that Patterson had testified that Phenix (1) had participated in developing the tools and (2) confirmed that Patterson had correctly calculated Kent's score. The State objected on hearsay grounds. The court ruled as follows:

> I'm not going to just open the door to whatever hearsay is going to be coming in or not coming in. You know, the objections and statements as to Dr. Patterson are not timely. They should have been made at the time he was testifying. As to Dr. Rosell, he can explain again with the narrow basis for why he consulted . . . Dr. Looman in a similar fashion as what Dr. Patterson had done, but if there's an objection that it's hearsay and I find it's hearsay, then I'm not going to allow it.

3 VRP at 504. On redirect, Rosell testified without objection that Looman, "one of the Static-99R coding people . . .who helps them out with the coding rules," confirmed that Rosell had correctly calculated the lower-risk scores. 3 VRP at 521-22.

Rosell ultimately opined that, if released into the community, the probability that Kent would reoffend was less than 50 percent. The State recalled Patterson to give rebuttal testimony, during which Patterson, without objection, described his consultation with Phenix in more detail,

5

identifying her by name as "one of the authors of the scoring manual for both of the static tools."
3 VRP at 561-62.

The jury returned a verdict finding that the State had proved beyond a reasonable doubt that Kent was a sexually violent predator. The trial court entered an order indefinitely committing Kent to the Special Commitment Center and to the Department of Social and Health Services. Kent timely appeals.

## ANALYSIS

Kent contends that his trial attorney rendered ineffective assistance by failing to object to Patterson's testimony that he had consulted with Phenix and that Phenix confirmed the accuracy of Patterson's scoring procedure on the Static-99R and Static-2002R actuarial tools. The failure to object was unreasonable, Kent argues, because he had obtained a pretrial ruling prohibiting Patterson from testifying to the opinions of other experts, because Kent's age was the main factor in his defense, and because the experts' decisions on how to score him on that factor was the major issue in contention at trial. Kent asserts that the failure to object prejudiced him because (1) the trial court's remarks and pretrial ruling show that it would have sustained a timely objection, (2) the higher scores on the actuarial tools increased the credibility of Patterson's risk assessment, which was critical to the State's case, and (3) without Phenix's stamp of approval, there was little basis for jurors to believe Patterson over Rosell.

Finding defense counsel's conduct reasonable under the circumstances, we affirm.

### I. STANDARD OF REVIEW

We review claims of ineffective assistance de novo. *State v. A.N.J.*, 168 Wn.2d 91, 109, 225 P.3d 956 (2010). To prevail on such a claim, a defendant must show that "(1) his counsel's performance fell below an objective standard of reasonableness and, if so, (2) that counsel's poor

work prejudiced him." *A.N.J.*, 168 Wn.2d at 109. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). We apply "a strong presumption that defense counsel's conduct is not deficient." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). An appellant rebuts this presumption by showing that "no conceivable legitimate tactic explain[s] counsel's performance." *Reichenbach*, 153 Wn.2d at 130. To prevail on an ineffective assistance claim based on counsel's failure to object to evidence, an appellant "must show that not objecting fell below prevailing professional norms, that the proposed objection would likely have been sustained, and that the result of the trial would have been different if the evidence had not been admitted." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (footnotes omitted).

## II. KENT FAILS TO SHOW DEFICIENT PERFORMANCE

Under ER 703 and 705, the trial court had discretion to allow Patterson to testify concerning his consultation with Phenix. ER 703 provides that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

ER 705 provides that

> [t]he expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination.

Read together, these rules allow expert witnesses to testify concerning the reasons for their opinions, even though the information relied on is inadmissible hearsay:

Rule 705 states that an expert may "give reasons" for his or her opinion "unless the judge requires otherwise." And since Rule 703 allows an expert to base an opinion upon hearsay if it is reasonable to do so, Rule 705 permits (but does not require) the court to allow the expert to relate the hearsay to the jury to explain the reasons for his or her opinion, subject to appropriate limiting instructions.

5B KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE § 705.4, at 292 (5th ed. 20007) (footnotes omitted).

Under these rules, Kent's attorney faced a choice between either (1) foregoing a vigorous challenge to Patterson's credibility based on the scoring change in the hope of keeping Patterson's consultation with Phenix from the jury, or (2) attempting to exploit the scoring change to undermine Patterson's credibility in spite of the risk that the jury would hear about the Phenix consultation. We cannot say that the attorney's decision to pursue the latter course was unreasonable in light of the alternative, particularly because Kent's expert witness, Rosell, had consulted with an authoritative expert who confirmed Rosell's original results.

Kent attempts to avoid the conclusion that his trial attorney made a reasonable tactical decision by pointing to the trial court's order on Kent's motion in limine, which prohibited Patterson from testifying to opinions that nontestifying experts had reached regarding Kent. That motion, however, addressed "psychologists, counselors and mental health workers who came into contact with Mr. Kent in the past" and "opinions of other non-testifying witnesses who may have conducted evaluations of Mr. Kent or who have arrived at some opinion about Mr. Kent." CP at 91. Phenix's opinion related by Patterson concerned the proper procedure for scoring that portion of the actuarial tools addressing the offender's age at the time of release. Phenix's opinion did not concern Kent individually, whom Phenix did not evaluate. Thus, the court's ruling on the motion in limine did not cover this testimony by Phenix. Kent fails to show that the trial court would likely have sustained an objection to Patterson's testimony regarding Phenix.

We conclude that the decision by Kent's counsel not to object to testimony about Patterson's consultation with Phenix conceivably furthered a legitimate tactical purpose. Kent thus fails to show that his attorney's conduct fell below an objective standard of reasonableness.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, A.C.J.

BJORGEN, A.C.J.

We concur:

WORSWICK, J.

MELNICK, J.