# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the<br>Personal Restraint Petition of<br><br>STEPHANIE MARELDA SALYERS,<br><br>Petitioner. | No.  49799-9-II<br><br><br><br>UNPUBLISHED OPINION |

PENOYAR, J.[*] — In 2016, Stephanie Salyers entered an *Alford*[1] plea to one count of first

degree custodial interference.[2]  She now argues in a personal restraint petition (PRP) that she

should be permitted to withdraw her plea because (1) it lacks a factual basis, (2) her counsel

rendered ineffective assistance when he misadvised her of a collateral consequence of the plea and

failed to adequately investigate her case, (3) she was not released from jail under CrR 3.2, and (4)

she has shown egregious governmental misconduct.  Because (1) Salyers's plea has a factual basis,

(2) she fails to show ineffective assistance of counsel, (3) she waived her CrR 3.2 argument, and

---

[*] Judge Joel M. Penoyar is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[2] RCW 9A.40.060(1)(a).

(4) she has not shown that the misconduct she alleges resulted in actual and substantial prejudice, we deny Salyers's PRP.

FACTS

## I. BACKGROUND[3]

On February 19, at a shelter care hearing, a juvenile court placed Salyers's three children in state custody. Two days later, police responded to a report that Salyers had found her children and removed them from state custody in violation of the shelter care orders. The family from whose home Salyers had taken her children reported that she had come to their home, claimed she was allowed to visit the children, and then, when she was unsupervised, fled with the children through a bedroom window.

Later in the day on February 21, police located Salyers and arrested her for kidnapping. At the time of her arrest, Salyers had left her children at a friend's home while Salyers and her friend gathered belongings from Salyers's home. Police questioned Salyers's friend, who said that Salyers intended to leave the area with her children.

Salyers maintained her innocence, stating that she had never been given paperwork saying that she could not have her children. Incident reports and a probable cause statement that was not sworn to "under penalty of perjury" documented that Salyers had been present at the shelter care hearing and also that shelter care orders had been entered.[4] The shelter care orders stated that

---

[3] The facts in sections I and II are from incident reports and a probable cause declaration that Salyers received as discovery on March 11, the custody orders from the February 19 hearing, Salyers's statement on plea of guilty and associated documents, her judgment and sentence, and the supplemental record provided by Salyers.

[4] One incident report incorrectly states that a police officer, Detective Sandra Aldridge, was present at the shelter care hearing. Subsequent reports correct this statement and say that Detective

Salyers's children were in the Department of Social and Health Services' (DSHS's) temporary custody.

## II. CHARGES AND PLEA

On February 24, the State charged Salyers with three counts of first degree custodial interference, one for each child. Salyers's attorney received as discovery from the prosecutor the information, incident reports, and probable cause statement associated with her February 21 arrest, setting forth the background facts above.

On March 18, Salyers entered an *Alford* plea to one count of first degree custodial interference. In her signed statement on plea of guilty, she agreed that the superior court could review associated police reports and the probable cause statement for her kidnapping charges to establish a factual basis for her plea. Her statement on plea of guilty also expressly incorporated the prosecutor's plea offer.

The plea offer included provisions that the prosecutor would recommend 30 days of confinement and the entry of no-contact orders prohibiting Salyers from contacting her children for five years. The plea offer also allowed the no-contact order provision to "be addressed post-conviction in conjunction with family court/dependency proceedings." Resp. to PRP, App. D at 14 (underlining omitted). Salyers signed the plea offer's last page, following the provisions discussing the no-contact order recommendation. Her signature was directly below the statement that she had reviewed the offer's terms with her attorney and understood them.

---

Aldridge was not present at the shelter care hearing but was "in direct communication with" the DSHS worker who was present at the hearing. PRP, App. B at 9. The DSHS worker claimed that Salyers was present at the hearing when her children were placed in state custody and was given paperwork stating as much.

The superior court sentenced Salyers to 30 days of confinement and entered no-contact orders preventing her from seeing her children until March 2021.

### III. PRP AND APPENDICES

In December, Salyers filed a CrR 7.8 motion, which the superior court transferred to this court as a PRP. She relies on various video recordings and documents as supporting evidence, the relevant portions of which are summarized below.

### A. SHELTER CARE HEARING VIDEO AND ORDER

Salyers relies upon a video recording of the juvenile court's oral ruling at the February 19 shelter care hearing. With Salyers present, the juvenile court found that "your children would be in serious danger right now if I placed them back with you" and twice stated its ruling "that there is shelter care [sic]." Ex. 3 at 19 sec. to through 33 sec., 2 min. 12 sec.

The juvenile court directed the prosecutor to prepare a written order for presentation the following week. The prosecutor informed Salyers that the social worker assigned to her case would be changing, that she could contact the social worker to set up ongoing visitation, and that a visit would be set up for the following Monday at DSHS.

After court was adjourned, Salyers left the courtroom, and the juvenile court inquired whether the prosecutor had "anything . . . to keep the kids in shelter care over the weekend." Ex. 3 at 4 min. 54 sec. through 4 min. 57 sec. The prosecutor answered affirmatively.

In addition to the shelter care hearing video, Salyers relies upon the shelter care orders from the February 19 hearing. The orders are unsigned by Salyers.

B.  Salyers's Declaration

Salyers also relies upon her declaration, signed under penalty of perjury, describing her interactions with her defense attorney and her understanding of her guilty plea's effect.  In her declaration, Salyers claims that her defense counsel visited her only once in jail and discussed her case with her for only a few minutes.  Salyers provides a jail record of her attorney's only visit on March 15, confirming that he stayed for merely six minutes.  She claims her counsel did not review any discovery, mention any efforts to investigate her case, or do more than advise her to accept the State's plea offer.

Salyers states that her attorney affirmatively "advised me to accept the State's plea offer so I could get out of jail and see my children."  PRP, App. DD at 2.  He summarized the plea offer without including notice that she "would lose" her children and told her "flat out that signing the plea agreement was the 'quickest way to get reunited with [my] children'" and that "pleading would get me back with them."  PRP, App. DD at 2-3 (alteration in original).  According to Salyers, "I would not have ever entered the '*Alford*' plea if I knew . . . that there was any possibility of a no contact order being entered that barred me from being with my children for another day, let alone five years."  PRP, App. DD at 3.

Salyers acknowledges her signature on the plea offer but claims that she signed the offer based entirely on her attorney's summary, which did not include any possibility that she might lose her children.  She claims that she was not given a copy of the plea offer and her attorney did not read it to her before she signed it.

## C. PLEA HEARING TRANSCRIPT

Salyers also relies upon an unofficial transcript of the plea hearing, which was not prepared by a court transcriptionist. According to the transcript, Salyers answered affirmatively when the superior court questioned whether she had reviewed her statement on plea of guilty, discussed it with her attorney, and understood what was in the statement. The superior court did not ask Salyers whether she had read the plea offer or refer to the no-contact order provision until after Salyers had entered her plea.

When the parties discussed Salyers's sentence, the prosecutor referred to the no-contact order provision and requested "standard conditions including formal no-contact orders with the children." PRP, App. EE at 6. The superior court ruled that Salyers's sentence would "include the no-contact order," and Salyers acknowledged that she understood that violating the no-contact order would worsen her situation. PRP, App. EE at 9.

## D. "RETALIATION" APPENDICES

Salyers also relies on various materials to support her claims of police misconduct and retaliation, summarized below. Some of her materials relate to an incident at her home on February 16, when police arrested Salyers and her husband.

### 1. 2014 E-MAILS

First, Salyers relies upon e-mails from 2014. A single e-mail, sent to the entire Vancouver Police Department, criticizes "a couple [Child Protective Services] social workers shopping for officers/deputies in the field and requesting they sign children into protective custody, after [Children's Justice Center] has told them we do not have [probable cause]," a practice known as

"pink-sheet shop[ping]." PRP, App. V. The e-mail warns officers to ensure they do not "sign the pink sheets" without probable cause. PRP, App. V.

Salyers also relies upon a string of e-mails between Detective Aldridge[5] and another person in 2014. The other person complains about "dumb lazy officers who either don't know how to or won't do the child protective custody thing when they should." PRP, App. W at 1. Detective Aldridge responds that officers should "turn off MDC" (recording device), "get kid," and "'get' the other people who made this mess." PRP, App. W at 1. The other person responds, "Time to buy another shovel," to which Detective Aldridge says she will "help dig." PRP, App. W at 1.

2.     FEBRUARY 16, 2016 PROBABLE CAUSE STATEMENT

Salyers relies upon Detective Aldridge's probable cause statement for Salyers's husband's February 16, 2016 arrest for assaulting Salyers. As set forth in this probable cause statement, on February 16, Salyers's family reported to 911 that Salyers had called her mother while Salyers's husband was assaulting her. Salyers told her family that her husband had kneed her and broken her finger, and Salyers's family believed they heard a physical struggle and choking.

Police reported to Salyers's home, where neither Salyers nor her husband would exit their home or allow officers inside, stating that the police officers were "foreign agents." PRP, App. O. Officers entered the home and arrested Salyers's husband for assault[6] and Salyers under an outstanding misdemeanor warrant for driving with a suspended license. In the probable cause

---

[5] Detective Aldridge is one of the officers who reported to Salyers's home on February 16, after Salyers's family reported that Salyers's husband was assaulting her.

[6] The charges against Salyers's husband were dismissed on March 7 because the prosecution could not secure witnesses. Salyers was released from custody on February 17.

statement, Detective Aldridge wrote that she observed an injury to Salyers's hand, between her fingers, and that officers noticed red marks consistent with strangulation on Salyers's neck.

3.  FEBRUARY 16 INCIDENT REPORTS

Salyers also submits incident reports from Detective Aldridge and other officers who reported after Salyers's family's 911 call on February 16. The incident reports document that officers did not observe injuries consistent with Salyers's claim that her husband had hurt her back and broken her fingers, including any "obvious" injuries to Salyers's hands. PRP, App. Q at 21. However, other officers, including Detective Aldridge, did observe that Salyers had a recent abrasion on her hand. According to Detective Aldridge's report, Salyers claimed the injury, which was between her fingers, was from washing dishes.

One officer documented that she had placed Salyers in a neck restraint when Salyers resisted arrest to prevent injury to others. The officer and Detective Aldridge observed red markings on Salyers's neck that were not caused by the neck restraint.

4.  KIDNAPPING DISPATCH CALL TRANSCRIPT

Salyers relies upon a transcript that she alleges is a dispatch recording from Detective Aldridge's 911 call on the day that Salyers was arrested for custodial interference. Detective Aldridge explains that there had been a shelter care hearing the week before and says, "They [Salyers and her husband] were extremely unhappy about that. They're like Constitutionalists, don't trust the government, blah, blah, blah." PRP, App. CC at 3.

ANALYSIS

I. PRP LEGAL PRINCIPLES

Where a PRP petitioner had a prior opportunity or avenue for judicial review, the petitioner must meet a high standard to obtain relief. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). For claimed constitutional error in a PRP, the petitioner must show actual and substantial prejudice. *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013).

We may grant, deny, or transfer a PRP to the superior court for a full determination on the merits. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). We grant the PRP if the petitioner shows actual and substantial prejudice. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885, 828 P.2d 1086 (1992). We deny the petition if the petitioner fails to show actual and substantial prejudice. *Rice*, 118 Wn.2d at 885. And we transfer to a superior court for a reference hearing if the petitioner makes a prima facie showing of error, but we cannot determine the merits of her contentions solely on the record. *Yates*, 177 Wn.2d at 18.

In addition to actual and substantial prejudice, the petitioner must establish that she is under a "restraint" that is "unlawful" for one of the reasons set forth in RAP 16.4(c). As relevant to Salyers's PRP, restraint is unlawful if a conviction was obtained in violation of the state or federal constitution or state law. RAP 16.4(c)(2).

The petitioner must state with particularity the facts underlying the claim of unlawful restraint and the available evidence to support those factual allegations. *Rice*, 118 Wn.2d at 885-86. "Bald assertions and conclusory allegations" are insufficient. *Rice*, 118 Wn.2d at 886. "If the petitioner's allegations are based on matters outside the existing record, the petitioner must

demonstrate that [she] has competent, admissible evidence to establish the facts that entitle [her] to relief." *Rice*, 118 Wn.2d at 886.

"Generally, if a petitioner enters a guilty plea, the petitioner must show that a new trial is necessary 'to correct a manifest injustice,' but 'a guilty plea . . . generally bars a later collateral attack based on newly discovered evidence.'" *In re Pers. Restraint of Spencer*, 152 Wn. App. 698, 708, 218 P.3d 924 (2009) (internal quotation marks omitted; alteration in original) (quoting *State v. Mendoza*, 157 Wn.2d 582, 587; *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 783-84, 192 P.3d 949 (2008)). Where the petitioner entered an *Alford* plea, we grant relief if the petitioner shows that the evidence, viewed in balance with the record, changes the factual basis for her plea. *Spencer*, 152 Wn. App. at 708.

## II. THRESHOLD ISSUE: "NEWLY DISCOVERED EVIDENCE"

Because Salyers brought this claim within one year of the judgment she attacks, we need not address whether she has produced "[n]ewly discovered evidence" that would allow her to avoid RCW 10.73.090(1)'s one-year time-bar. RCW 10.73.100(1). We proceed directly to whether Salyers's various arguments show actual and substantial prejudice. *See In re Pers. Restraint of Faircloth*, 177 Wn. App. 161, 165 n.4, 311 P.3d 47 (2013).

## III. FACTUAL BASIS ARGUMENTS

Salyers argues that we should allow her to withdraw her *Alford* plea because she has provided evidence undermining the factual basis for the intent element of custodial interference. We disagree.

We grant relief if a petitioner shows a manifest injustice by providing evidence that viewed in balance with the record, changes the factual basis for her plea. *Spencer*, 152 Wn. App. at 708.

A factual basis exists where there is sufficient evidence for a jury to conclude that the defendant is guilty.[7] *State v. Newton*, 87 Wn.2d 363, 370, 552 P.2d 682 (1976). Thus, a petitioner prevails if she makes a showing that a manifest injustice exists because there is no longer sufficient evidence in the record that could support a jury finding of guilt.

Here, the issue raised is intent. Under RCW 9A.40.060(1)(a), first degree custodial interference occurs when,

> [a] relative of a child under the age of eighteen . . . *with the intent to deny access to the child . . . by a parent, guardian, institution, agency, or other person having a lawful right to physical custody . . .* takes, entices, retains, detains, or conceals the child . . . from a parent, guardian, institution, agency, or other person having a lawful right to physical custody . . . and
> . . . . Intends to hold the child . . . permanently or for a protracted period.

(Emphasis added.) "The State must establish a defendant is aware of the existence of the order to prove the defendant intentionally violated it." *State v. Boss*, 167 Wn.2d 710, 720, 223 P.3d 506 (2009).

In this case, the probable cause statement and incident reports state that at the shelter care hearing, Salyers was presented with an order stating that her children were in state custody.[8] In support of her PRP, Salyers provides materials contradicting that she was presented with shelter

---

[7] Thus, a factual basis requires less than that the trial court was convinced of the defendant's guilt beyond a reasonable doubt. *State v. Newton*, 87 Wn.2d 363, 370, 552 P.2d 682 (1976).

[8] In her PRP, Salyers briefly argues that there was no factual basis because neither the probable cause statement nor the incident reports were sworn to under penalty of perjury. But in her statement on her guilty plea, she agreed that the probable cause statement and incident reports could be considered to determine whether there was a factual basis for her plea. Further, there is no requirement that a probable cause statement or incident reports contain a perjury statement in order to be relied upon by the trial court. Rather, "the factual basis for the plea may come from *any* source the trial court finds reliable" so long as the material relied upon is part of the record. *Newton*, 87 Wn.2d at 370 (emphasis added).

care orders at the hearing, including a transcript of the shelter care hearing and a video recording of the proceedings.[9] From the transcript and video, it appears that Salyers left the courtroom after the juvenile court orally ruled her children would remain in state custody, directed the prosecutor to prepare a written order for presentation the next week, and adjourned the hearing. It was only after Salyers left the courtroom that the juvenile court noted that it needed a written order to keep Salyers's children in custody over the weekend. In addition, the custody orders are unsigned by Salyers.

Certainly, the shelter care order should have been signed in Salyers's presence. But having made the mistake of excusing Salyers before the order was signed, the trial court correctly realized that an order needed to be signed ex parte so that the State had continued lawful custody of the children over the weekend. *See* RCW 13.34.060(1). And because the order was signed ex parte, a reasonable effort should have been made to serve the order on Salyers as soon as was practicable. However, none of this vitiates the factual basis for her plea.

It is clear from the record that even if Salyers believed the State did not have valid authority to keep her children in custody until written orders were entered, she had no intention of returning her children to state custody the next week, when she was told the written orders would be entered. Salyers went to the house where she knew her children were staying, lied about her purpose, and then absconded with her children through a bedroom window. She later left her children at another

---

[9] We note that the State objects to our reliance on Salyers's unofficial transcripts of proceedings including the shelter care hearing insofar as the transcripts support Salyers's arguments. But in our view, Salyers's materials undermine, rather than support, her arguments, so that we do not decide whether any of Salyers's materials should be excluded.

location while she and a friend gathered belongings from Salyers's home. And when questioned by police, Salyers's friend told police that Salyers intended to leave the area with her children.

We hold that there is sufficient evidence to show that even if Salyers believed the State did not have lawful authority over her children until written orders were entered, she nevertheless had the intent to keep her children *after* the orders were signed, once again giving the State legal custody. Thus, there is a factual basis to find that when she took the children, she acted with the "intent to deny access to the child . . . by a . . . person having a lawful right to physical custody." RCW 9A.40.060(1)(a). In sum, Salyers fails to show that there is no longer sufficient evidence in the record to support a jury finding of guilt on the intent element of custodial interference.[10] Accordingly, we hold that she has not established a manifest injustice and is not entitled to withdraw her plea.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENTS

Salyers argues that she received ineffective assistance of counsel, such that she should be allowed to withdraw her guilty plea. She bases her claim on two alleged failures: failure to advise her that the plea included a no-contact order preventing her from seeing her children and failure to adequately investigate her case. We disagree that Salyers has shown ineffective assistance of counsel in either respect, as set forth below.

---

[10] We do not need to reach Salyers's arguments that under *Boss* and *State v. Kirwin*, 166 Wn. App. 659, 271 P.3d 310 (2012), mere presence during the juvenile court's oral ruling that the children would be in state custody over the weekend was insufficient. Neither do we reach Salyers's arguments, first raised in her reply, that she was a "parent," not a "relative," of her children and that DSHS, not the family from whom Salyers took her children, had the lawful right to custody of her children. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3(a)(6).

A. Legal Standards

We review de novo ineffective assistance of counsel claims. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). If a petitioner successfully shows ineffective assistance of counsel, she necessarily meets her burden to show actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

A petitioner must establish both deficient performance and resulting prejudice to prevail on a claim of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To show deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness," based on "prevailing professional norms." *Strickland*, 466 U.S. at 688. A reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

To show prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the plea bargaining context, the prejudice test is whether but for counsel's errors, the petitioner "'would not have pleaded guilty and would have insisted on going to trial.'" *Reise*, 146 Wn. App. at 788 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)). "Inaccurate advice about a collateral consequence may be prejudicial when it causes a defendant to plead guilty." *Reise*, 146 Wn. App. at 788.

## B. FAILURE TO INFORM OF COLLATERAL CONSEQUENCE

### 1. NOT DEFICIENT PERFORMANCE

Salyers argues that her counsel's performance during plea bargaining was deficient because her counsel affirmatively misadvised her of the collateral consequence[11] that the prosecutor would recommend that a no-contact order be entered against her and that pleading guilty was the quickest way to be reunited with her children. We disagree.

Our Supreme Court has distinguished between "direct" and "collateral" consequences of a plea bargain. *State v. A.N.J.*, 168 Wn.2d 91, 113-14, 225 P.3d 956 (2010). For direct consequences—those representing a definite, immediate, and largely automatic effect on the range of punishment—the defendant must be informed of the consequences. *A.N.J.*, 168 Wn.2d at 113-14. Although a defendant need not be informed of all collateral consequences, affirmative misinformation about a collateral consequence permits withdrawal of a plea if the defendant relies on that misinformation when deciding to plead guilty. *A.N.J.*, 168 Wn.2d at 114; *Reise*, 146 Wn. App. at 787. "Misinformation with respect to the outcome of an *Alford* plea is especially problematic" because a defendant unwilling to admit culpability will "rapidly change[] [her] calculations about the costs and benefits of standing trial." *State v. Stowe*, 71 Wn. App. 182, 187-88, 858 P.2d 267 (1993).

---

[11] Both Salyers and the State agree that the entry of a no-contact order was a collateral consequence. They correctly discern that a no-contact order is not a "definite" and "automatic" result of a first degree custodial interference conviction. *State v. A.N.J.*, 168 Wn.2d 91, 114, 225 P.3d 956 (2010). Rather, "[a]s part of any term of community custody, the [sentencing] court *may* order an offender to" "[r]efrain from direct or indirect contact with the victim of the crime." RCW 9.94A.703(3)(b) (emphasis added).

In support of her PRP, Salyers provides her own declaration, signed under penalty of perjury, that her attorney affirmatively advised her that pleading guilty was the quickest way for her to be reunited with her children. She further claims that she would not have entered the plea had she known "that there was any possibility of a no contact order being entered." PRP, App. DD at 3. Salyers's claims strain credulity: it is unlikely under the circumstances that Salyers believed pleading guilty would immediately reunite her with her children because Salyers knew that her children were in state custody and that there was a pending dependency case.

However, even if we accept as true Salyers's claim that she believed her attorney when he told her that pleading guilty was the quickest way for her to be reunited with her children, Salyers fails to show that this advice was incorrect. Salyers faced the possibility of conviction of three counts of custodial interference and a one-year sentence. RCW 9.94A.505(2)(b) (unranked felonies bear 0- to 12-month sentences); former RCW 9.94A.515 (2015) (custodial interference not ranked). And if she were convicted at trial, the prosecutor could still recommend the imposition of no-contact orders at sentencing.

But if Salyers accepted the plea offer, she faced only a 30-day sentence with the no-contact orders that in all likelihood would also have been entered had she gone to trial and lost. Further, her attorney could reasonably have factored into his advice that Salyers could move to vacate the no-contact orders because the plea offer included that the no-contact orders could "be addressed post-conviction in conjunction with family court/dependency proceedings."[12] Resp. to PRP, App.

_____

[12] We note that since Salyers entered her plea, the Supreme Court has indicated that the duration of a no-contact order entered under RCW 10.99.050 cannot exceed the length of the sentence actually imposed. *See State v. Granath*, __ Wn.2d __, 415 P.3d 1179, 1183 (2018).

D at 14 (underlining omitted). Indeed, this appears to be what the parties anticipated: at the plea hearing, the prosecutor noted that he had informed Salyers's defense counsel that the no-contact orders would "likely be . . . addressed at a later date in conjunction with how things proceed in those dependency . . . matters." PRP, App. EE at 7. Based on these facts, it was reasonable for Salyers's attorney to advise that the quickest way for her to be reunited with her children would be to accept the plea offer. Salyers fails to show that her attorney misadvised her.

Salyers relies on *State v. Sandoval*, in which an attorney's advice about the immigration consequences of pleading guilty—advice that left the impression that deportation was a remote possibility—constituted deficient performance. 171 Wn.2d 163, 173-74, 249 P.3d 1015 (2011). However, the attorney's performance in *Sandoval* was deficient because the attorney essentially gave wrong advice that his client would not be deported when, in fact, his client was deportable. 171 Wn.2d at 174. Here, as set forth above, Salyers's attorney did not misadvise her, and thus we decline to hold that Salyers's attorney rendered deficient performance.

Salyers fails to overcome the strong presumption that her counsel's performance was "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Although we find no deficient performance, we also address her prejudice argument.

2. PREJUDICE

Salyers argues that but for her counsel's deficient performance, she would have insisted upon going to trial, so that she has shown prejudice and should be allowed to withdraw her plea. In addition to failing to show deficient performance, Salyers fails to show prejudice.

Salyers maintains that she would not have accepted the plea bargain if she had known the prosecutor would recommend a five-year no-contact order barring her from seeing her children.

She contends that she did not read the plea offer for herself and relied upon her attorney's verbal summary, which did not include that the prosecutor would recommend a no-contact order. But Salyers signed the plea offer directly below the provision about the no-contact order recommendation. Her signature acknowledges that she had reviewed and understood the terms of the offer. Thus, Salyers's claim that she did not read the offer and knew no more about it than her attorney's summary is contradicted by her signature on the plea offer.[13]

And even if it were unclear from the plea offer that Salyers understood that it included the no-contact order recommendation, the no-contact provision was discussed elsewhere in the record. For instance, Salyers provides a transcript of her plea hearing that shows she was aware that a no-contact order would be entered against her. And at the hearing on Salyers's guilty plea, after the superior court accepted her plea, the prosecutor briefly discussed the no-contact order. Then, the superior court ruled that it would incorporate a no-contact order into the judgment and sentence, pursuant to the prosecutor's recommendation:

> Judge: All right, we'll go ahead and, uh, put that in place with a judgment [and] sentence. It is going to include the no-contact order with the children at this time, and it's imperative that you follow that no-contact order, because if you were, for even what you believe are good intentions, to violate that, it's only going to make the, uh, situation for you substantially worse. Do you understand that?
>
> [Salyers]: Yes, Your Honor.

---

[13] In our view, it would have been preferable for the plea offer to include more specific language, such as the language in the statement on plea of guilty that Salyers had "fully discussed" with her attorney and understood "all of the above paragraphs." PRP, App. D at 10. Nevertheless, Salyers's acknowledgment that she had reviewed and understood the offer's terms contradicts her claim that she did not read the offer.

PRP, App. EE at 9. Salyers did not object or do anything other than agree when the superior court asked if she understood that a no-contact order would be entered against her.

Salyers provides her own affidavit that her attorney affirmatively misinformed her of the no-contact order recommendation and that she relied on her attorney's misstatement rather than reading the plea offer. However, Salyers acknowledged when she signed the plea offer that she had read it, and the transcript she provides shows that Salyers was informed of the no-contact order provision and stated that she understood she would not be allowed to see her children after her release. In sum, Salyers's evidence in support of her PRP fails to establish that but for her attorney's misinformation, she would not have pleaded guilty.[14]

Salyers has shown neither deficient performance nor prejudice. We reject her ineffective assistance of counsel argument related to failure to advise her of a collateral consequence of her plea.

## C. FAILURE TO INVESTIGATE

Salyers argues that her attorney was ineffective because he failed to obtain the shelter care orders or obtain evidence about Detective Aldridge's "improper motive."[15] PRP at 24. We reject Salyers's argument because she fails to show that her counsel's performance was deficient in either regard.

---

[14] In her reply brief, for the first time, Salyers appears to raise a claim that her *Alford* plea was not voluntary because she was unaware of the no-contact order recommendation. We do not reach this argument. *See Cowiche Canyon Conservancy*, 118 Wn.2d at 809; RAP 10.3(a)(6).

[15] To the extent that Salyers argues that her counsel's assistance was necessarily ineffective because they met for only six minutes, standing alone, "[t]he alleged infrequency or brevity of counsel's meetings with defendant is not enough to demonstrate ineffective assistance of counsel." *State v. Cameron*, 30 Wn. App. 229, 232, 633 P.2d 901 (1981).

Effective assistance of counsel in the plea bargaining context includes sufficient investigation to evaluate the likelihood of a conviction so that the defendant can make a meaningful decision on whether to plead guilty. *A.N.J.*, 168 Wn.2d at 111-12.

Before pleading guilty, Salyers received as discovery incident reports and a probable cause statement summarizing that a DSHS worker was at the shelter care hearing and observed Salyers being informed that her children were in state custody. Further, the family from whose home Salyers took the children reported that she waited until the family left her unsupervised, then fled out a window with the children, which is circumstantial evidence of her intent. And the incident reports document Salyers's contention that she had not received any paperwork at the shelter care hearing.

In light of the facts set forth in the incident report and probable cause statement, counsel had sufficient information to properly assess the likelihood of conviction. Counsel's decision not to investigate whether Salyers signed the shelter care orders was not deficient. It was reasonable for counsel to determine that Salyers faced a high likelihood of conviction because regardless of whether she signed the shelter care orders, there was ample evidence to support that she was aware that by secreting the children she would be depriving the State of custody. Salyers cannot show deficient performance.

Salyers also argues that her counsel should have obtained "undisclosed discovery in the possession of law enforcement" showing Detective Aldridge's allegedly improper, retaliatory motives. PRP at 24. Salyers does not claim that she communicated any concerns about retaliatory police action to her attorney, nor does the discovery her counsel obtained include any suggestion of police misconduct. The duty to investigate in the plea bargaining context is only the duty to

investigate sufficiently to evaluate the likelihood of conviction. *See A.N.J.*, 168 Wn.2d at 111-12. Without showing that her attorney had any indication that Salyers believed she was the victim of retaliatory police action, Salyers cannot overcome the strong presumption that her counsel's performance was adequate.

We reject Salyers's claims of ineffective assistance of counsel for failure to investigate.

## V.  LACK OF PROBABLE CAUSE ARGUMENTS

CrR 3.2 relates to the conditions of release:  "[i]f the court does not find, or a court has not previously found, probable cause, the accused shall be released without conditions."  Relying on this rule, Salyers argues that she should have been released from custody because there was a lack of probable cause supporting her February 21 kidnapping arrest.  We hold that Salyers waived her argument.

In general, we do not review arguments first raised in this court, although we do review alleged constitutional error that is manifest error affecting a constitutional right.  RAP 2.5(a)(3). To fall within RAP 2.5(a)(3), Salyers must show both that the alleged error affects a constitutional right and is "manifest"—that it resulted in actual prejudice, a plausible showing that the asserted error had practical and identifiable consequences on the case.  *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009).

Here, Salyers was arrested for kidnapping and booked into jail on February 21.  The probable cause statement for her arrest is signed but not under penalty of perjury.  According to Salyers, lack of a perjury provision invalidates the probable cause statement.

However, Salyers provides no argument or factual support that shows she argued before the superior court that she should be released because the probable cause statement did not include

a perjury provision. She does not cite to RAP 2.5(a)(3) or discuss the federal Fourth Amendment. Her claim is purely based on CrR 3.2's provision for pretrial release.

Further, Salyers's sole contention that she was actually prejudiced by the allegedly unlawful arrest is her claim that because she was in jail, she could not investigate her case to timely obtain "exculpatory evidence." PRP at 30. But Salyers had an appointed attorney, and she provides no explanation of why her attorney could not have as effectively investigated and obtained evidence as Salyers could have, had she apprised her attorney of her alleged exculpatory evidence.

Not only does Salyers fail to satisfy RAP 2.5(a)(3), but by entering an *Alford* plea, Salyers waived the right to an appeal, including the right to appeal the denial of any pretrial motions. *See State v. De Rosia*, 124 Wn. App. 138, 143, 100 P.3d 331 (2004); *State v. Olson*, 73 Wn. App. 348, 353, 869 P.2d 110 (1994). For these reasons, we hold that Salyers waived her argument.

VI. GOVERNMENTAL MISCONDUCT ARGUMENTS

Salyers requests that this court dismiss her plea under CrR 8.3(b). She claims that police action amounted to egregious governmental misconduct. We hold that Salyers fails to show actual and substantial prejudice.

A. PROPRIETY OF CRR 8.3(b)

CrR 8.3(b) authorizes a court to dismiss "any criminal prosecution" for governmental misconduct if the accused's rights have been prejudiced and that prejudice materially affects the accused's right to a fair trial. CrR 8.3(a) discusses the dismissal of an "indictment, information or complaint"; CrR 8.3(b) refers to dismissal of a "prosecution"; and CrR 8.3(c) authorizes a pretrial

motion to dismiss a "charge." But no portion of CrR 8.3 refers to dismissal of a "conviction" or "judgment."

Rather, relief from a "final judgment" or "order" is available under CrR 7.8. And a CrR 7.8 motion may be transferred to this court for consideration as a PRP when the defendant has not made a substantial showing that she is entitled to relief or when resolution of the motion will not require a factual hearing. CrR 7.8(c).

Thus, CrR 7.8, not CrR 8.3, is the mechanism for collateral attacks on a criminal judgment. Insofar as Salyers's motion transferred to this court as a PRP relies on CrR 8.3(b) for postconviction relief, her motion is procedurally improper. However, to facilitate review of Salyers's governmental misconduct arguments on the merits, we treat Salyers's contentions as arguments that her constitutional right to a fair trial was infringed upon. Accordingly, we look to whether Salyers has shown actual and substantial prejudice.

## B. NO ACTUAL AND SUBSTANTIAL PREJUDICE

Salyers must show governmental misconduct that actually and substantially prejudiced her right to a fair trial. To do so, Salyers relies upon evidence that she claims shows that the initial entry into Salyers's home was unlawful and that Detective Aldridge lied about observing Salyers's injuries, called in improper "'favors'" to have Salyers booked into jail, and lied about being present at the shelter care hearing. PRP at 33. To substantiate these claims, Salyers relies on a 2014 e-mail exchange between Salyers and another person, another 2014 e-mail about "pink-sheet shop[ping]," the probable cause statement and incident reports in support of Salyers's initial arrest,

23

Clark County booking procedures, and dispatch transcripts from Salyers's initial arrest and kidnapping arrest. PRP, App. V.

Of all these materials, the only evidence implicating Detective Aldridge's involvement related to the custodial interference charge is that Aldridge called dispatch to confirm the report that Salyers had kidnapped her children. Detective Aldridge apparently called 911 to confirm the address from which Salyers took the children. In the course of the conversation, Detective Aldridge described Salyers and her husband as "Constitutionalists" who "don't trust the government" and were "extremely unhappy" that their children were kept in state custody. PRP, App. CC at 3.

Salyers fails to show actual and substantial prejudice to her right to a fair trial because Detective Aldridge's involvement was unrelated to evidence that Salyers committed custodial interference. Detective Aldridge was not present at the shelter care hearing, did not provide the probable cause statement related to the custodial interference charge, and did not write the related incident reports. Indeed, Detective Aldridge's involvement was largely confined to Salyers's initial arrest under her misdemeanor warrant, and Salyers was released from jail related to that arrest before the shelter care hearing. We hold that the alleged governmental misconduct did not actually and substantially affect Salyers's right to a fair trial and reject her argument.

No. 49799-9-II

We deny Salyers's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PENOYAR, J.

We concur:

_____
BJORGEN, P.J.

_____
SUTTON, J.

25